Stanley Dion JAMES, Appellant,

v.

The STATE of Texas, Appellee.

Stephen JAMES, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 964–84, 965–84.

Court of Criminal Appeals of Texas,
En Banc.

Jan. 25, 1989.

Philip S. Ross, Houston, for Stanley Dion James.

Walter Boyd, Court-appointed on appeal only, Houston, for Stephen James.

John B. Holmes, Jr., Dist. Atty., James C. Brough and R.K. Hansen, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

McCORMICK, Presiding Judge.

Appellants were convicted by a jury of aggravated robbery and punishment was

assessed at ten years' confinement. The Court of Appeals for the First Supreme Judicial District abated both appeals and ordered that the trial court hold an evidentiary hearing to determine whether appellants' trial counsel had warned them "of the risks inherent in joint representation." See *Gonzales v. State*, 605 S.W.2d 278 (Tex.Cr.App.1980). The trial judge filed findings of fact and conclusions of law, determining there was no actual conflict of interest supporting appellants' claim of ineffective assistance of counsel in this matter. The appellate court disagreed and reversed both convictions on the ground that "[t]he potential arguments asserted by appellants' counsel on appeal represent an actual conflict of interest which arose in the representation of the James brothers and their representation was ineffective because of this conflict." *James v. State*, 677 S.W.2d 188 (Tex.App.Houston (1st) 1984). We will reverse the decision of the appeals court below.

The complainant testified that she was attacked by two men on August 4th as she sat in a car in the parking lot of the Red Dog Saloon, a bar located a short distance from the campus of the University of Houston. According to the complainant, one man opened the driver's door, pointed a gun at her, hit her over the head with the gun, and bit her arm several times while attempting to subdue her. The other man got into the passenger seat and held her head down. During the robbery, the car rolled backward and hit a parked car across the street from the bar. The man in the passenger seat got out of the car and the complainant was able to escape, dropping her purse in the process. The second man picked up the purse as the complainant ran inside the bar. The police were called and upon their arrival the complainant gave them a description of the two men. Stanley James was arrested two blocks away in the parking lot of a fast food restaurant and brought to the back door of the bar where the complainant identified him as the man who took her purse. Several months later, the complainant was in the courtroom for an early setting on Stanley's trial. Looking about the gallery, she recognized Stanley's brother Stephen and pointed him out as the man with the gun during the robbery.

A bar customer testified that he parked his car down the street and was walking toward the bar when he observed two men struggling inside a vehicle that was backed into another car parked across the street. He heard a woman screaming for help. He returned to his own car to get a club but upon his return the men were gone and the complainant was entering the bar. He positively identified Stephen several months later in the courtroom at the early setting in Stanley's trial and he testified that he believed Stanley was the other man he saw attacking the complainant.

The appellants presented mutually exclusive alibi defenses and did not incriminate one another through their own or their other six alibi witnesses' testimony. Their mother, a college professor, testified that she had visited Stephen at his home in Philadelphia three days before the robbery and had not seen him again until the early trial setting in Stanley's case. She related that at the time of the robbery she was talking with Stanley in his apartment two blocks from the scene of the crime. Stanley had just arrived home from work but left a short time later to go to the fast food restaurant for dinner.

Stanley's fiancee testified that she was also at the apartment when Stanley arrived after work but that she left almost immediately to make a telephone call in a booth located across the street from the Red Dog Saloon. After making the call, she met Stanley in the parking lot of the fast food restaurant on her way back to the apartment. She had separated from Stanley before the police arrived and detained him.

Stanley's employer, the president of American Vending Company, testified that he saw Stanley leave work that afternoon around the time of the robbery. The vending company is located across the street from the Red Dog Saloon. Stephen had also been previously employed by the company before moving to Philadelphia several months earlier.

A coworker at American Vending told the jury that she was driving down the street after leaving work when she had to apply her brakes to avoid hitting one of two men crossing the street toward the Red Dog Saloon. Upon reaching a stop sign, she heard a crash behind her and through her rear view mirror observed the complainant's vehicle backed into a car parked across the street from the bar. According to her testimony, the coworker made a U-turn to return to American Vending to pick up some letters she had forgotten. As she drove by the complainant's vehicle she observed the two men she had seen before struggling inside the car. As she walked up to the office door, she looked back in time to see the two men get out of the car, run toward her, then turn and run into an alley between American Vending and the building next door. She testified that she knew Stanley and Stephen because of their employment and that the two men she saw running were not the James brothers.

An employment agent and friend of Stephen's uncle in Philadelphia testified that she called Stephen at his sister-in-law's home in that city on the day of the incident and left a message for him regarding possible employment. Stephen called her back late in the afternoon and they talked for about fifteen minutes. She could not positively say whether the incoming call came from a local or a long distance exchange.

Another witness had subleased her apartment to Stephen in Philadelphia. She testified that she spoke with Stephen in front of the apartment either on the fourth, fifth or sixth day of August concerning overdue rent.

Stephen testified that he was at home in Philadelphia on the morning of the fourth of August and was at his sister-in-law's home at the time of the robbery.

Stanley testified that he got off work that afternoon and walked home. He changed his shoes and was sitting at the kitchen table talking with his mother when his fiancee left to make a telephone call. He left the apartment a few minutes later and walked across the street to the fast food restaurant where he was arrested and taken to the Red Dog Saloon and identified by the complainant.

We granted the State's petition for discretionary review to determine whether the appeals court erred in holding that appellants were denied effective assistance of counsel due to a conflict of interest arising from the representation of both appellants.

█ It is well settled that a criminal defendant is entitled to reasonably effective assistance of counsel at trial. See *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also, *Moore v. State*, 700 S.W.2d 193 (Tex.Cr.App.1985); *Ingham v. State*, 679 S.W.2d 503 (Tex.Cr.App.1984); *Passmore v. State*, 617 S.W.2d 682 (Tex.Cr.App.1981); *Ex parte Duffy*, 607 S.W.2d 507 (Tex.Cr.App. 1980); *Van Sickle v. State*, 604 S.W.2d 93 (Tex.Cr.App.1980). A defendant is not entitled to errorless counsel, and defense strategy or technique will not be judged by hindsight criteria. *Ex parte Perkins*, 706 S.W.2d 320 (Tex.Cr.App.1986); *Moore v. State*, supra; *Martin v. State*, 623 S.W.2d 391 (Tex.Cr.App.1981); *Mercado v. State*, 615 S.W.2d 225 (Tex.Cr.App.1981); *Ewing v. State*, 549 S.W.2d 392 (Tex.Cr.App.1977). The standard of reasonably effective assistance applies to both retained and appointed counsel. *Johnson v. State*, 614 S.W.2d 148 (Tex.Cr.App.1981).

█ Representation by the same attorney of multiple defendants in the same criminal trial has often been held by this Court to amount to ineffective assistance of counsel. *Ex parte Acosta*, 672 S.W.2d 470 (Tex.Cr.App.1984); *Ex parte McCormick*, 645 S.W.2d 801 (Tex.Cr.App.1983); *Ex parte Parham*, 611 S.W.2d 103 (Tex.Cr. App.1981); *Gonzales v. State*, supra; *Ex parte Alaniz*, 583 S.W.2d 380 (Tex.Cr.App. 1979). However, multiple representation is not per se violative of constitutional guarantees of effective assistance of counsel. See *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Ex parte Alaniz*, supra; *Hargett v. State*, 534 S.W.2d 909 (Tex.Cr.App.1976); *Stutes v. State*, 530 S.W.2d 309 (Tex.Cr.App.1975). Where a defendant does not object at trial

to multiple representation, he or she is required to show some *actual* and not merely speculative conflict of interest before being entitled to a reversal of the conviction on appeal. See *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed. 2d 333 (1980); see also *Almanzar v. State*, 702 S.W.2d 653 (Tex.Cr.App.1986); *Calloway v. State*, 699 S.W.2d 824 (Tex.Cr.App. 1985); *Foster v. State*, 693 S.W.2d 412 (Tex.Cr.App.1985); *Ex parte Acosta*, supra; *Polan v. State*, supra; *Ex parte Parham*, supra; *Ex parte Alaniz*, supra. Here neither appellant raised any objection at trial. Thus, the issue before us is whether there was an actual conflict between the interests of appellant Stephen James and those of his brother Stanley.

In *Foster*, supra, we said that an actual and significant conflict of interest of the degree requiring reversal exists when "one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing." *Foster*, supra, citing *Foxworth v. Wainwright*, 516 F.2d 1072 (5th Cir.1975). When counsel is so placed upon the "horns of a dilemma" as to services for one client over another, an actual and significant conflict exists and each client must be made aware of such conflict before the attorney may ethically proceed with the case. See ABA Standards Relating to the Administration of Criminal Justice, The Defense Function, Section 3.5(b), p. 123 (1974); see also Supreme Court of Texas, Rules Governing the State Bar of Texas, Article XII, Section 8 (Code of Professional Responsibility) DR 5–105 (1971); State Bar of Texas, Ethical Considerations on Code of Professional Responsibility EC 5–17 (1972).

In the case before us, the appeals court resolved the question in favor of appellants. The analysis of that court on the conflict issue bears repeating in its entirety:

"The attorney testified that he recognized the potential for a conflict from the beginning of preparation for the trial, but he felt that no actual conflict of interest ever arose. He based this opinion on the lack of any testimony by either defendant's alibi witnesses that damaged the other defendant. The attorney said he had not read the transcription of the trial testimony and was relying entirely on his memory of the case. He did not specifically recall whether one defendant had allegedly carried a gun or used more force than the other, or whether some witnesses had confused the two defendants. He did not maintain a file on the case, as he was called to assist his less-experienced colleague in trying the case, and his colleague had maintained the file. His colleague did not testify.

"Stephen and Stanley both testified that no one had mentioned the possibility of a conflict before or during trial. Stanley testified that the attorneys representing him advised his brother that 'it would be better as far as trying to get an acquittal' if they represented both brothers in one trial, because Stephen's alibi would help Stanley as well.

"Possibly the trial lawyers' strategy of 'sink or swim together' was the best defense available to the James brothers, if the welfare of both was equally important to counsel, but it is precisely this dilemma—the welfare of both versus the welfare of each—that spawned the conflict of interest in this case. Assuming that the two brothers, if represented by separate counsel, would each have been primarily interested in his *own* welfare, the conflicts become apparent.

"Stanley was living and working in the neighborhood where the offense occurred, and was arrested and identified near the scene moments after the police were called. Stephen, on the other hand, was living in Philadelphia when the offense occurred, and was not arrested and identified until several months later when he came to Houston for Stanley's trial. Stephen's separate counsel could have used these facts to argue that Stanley was more likely than Stephen to be one of the attackers because Stanley was in close proximity to the crime, and that Stanley's identification was more trust-

worthy than Stephen's identification because it occurred soon after the crime. Stanley's separate counsel could have used these same facts to argue that he had an innocent explanation for being in the neighborhood on the day in question, but that Stephen's unexplained presence in the neighborhood on the day in question was highly suspicious.

"Stanley's alibi was given by his mother and his fiancee. Stephen's alibi was given by a neighbor and a potential employer who lived in Philadelphia. Stephen's separate counsel could have used these facts to argue that Stanley's alibi was weaker than Stephen's alibi because Stanley's was given by close family members.

"Stephen was identified as the attacker who first opened the complainant's car door, who hit her on the head with the gun, bit her arm, and ordered her to move over so he could get in the car. Stanley was identified as the other robber who never spoke or harmed the complainant, but sat in the passenger seat of the car and later took her purse. Stanley's separate counsel could have used these facts to argue that Stephen's identification was more trustworthy than Stanley's, because the attacker with the gun occupied the complainant's attention during the robbery. Also, at the punishment phase of the trial, Stanley's separate counsel could have argued that these facts showed that Stanley was merely accompanying Stephen, and that Stanley should be treated more leniently than Stephen because he did not carry a gun or injure the complainant.

"There is some indication in the record that Stephen had previously been convicted for an extraneous offense. Stanley's separate counsel could have argued that his previously clean record made it less likely that he had been involved in the robbery because, unlike his brother, he had done nothing criminal in the past. Also, at the punishment phase of the trial, Stanley's separate counsel could have argued that he should be treated more leniently than Stephen because of Stephen's prior criminal record." [emphasis in original opinion]

The appeals court then held that under *Ex parte Parham* and *Gonzales v. State*, both supra, the potential conflicts represented actual conflicts of interest which denied the James brothers their right to effective assistance of counsel. *James v. State*, supra.

The problem with the appeals court analysis is precisely that potential, speculative conflicts of interest are, *post hoc*, elevated to the position of actual, significant conflicts. Judging from a hindsight position, it would perhaps have been better to try the James brothers separately, if we assume that each would have been willing to accuse the other of nefarious conduct. As earlier stated, however, it is not through hindsight that we will review an attorney's conduct, but through review of actual, significant conflicts of interest at time of trial that counsel should have been aware of and should have advised his clients of in the particular case. *Ex parte Perkins*, supra; *Almanzar v. State*, supra; *Moore v. State*, supra; *Calloway v. State*, supra.

■ The defense strategy at trial was to show that neither defendant could have committed the crime since both men were elsewhere during the crucial time period. As the State notes, both alibis were distinctly different and did not directly depend upon the testimony of any same witness. Both appellants testified, were subject to cross-examination, and held fast to their separate alibis. Neither appellant attempted to incriminate the other in any form or fashion, consistent with their joint defense. At the punishment phase, counsel reiterated the belief that the facts showed both men to be *innocent*. Moreover, there is no evidence in the record covering the trial or at the hearing ordered by the appeals court that either appellant would have been willing to forego his alibi defense or incriminate the other in any manner, or that either brother would adopt such a strategy if retrial was granted and separate trials were held.

What evidence we do have comes in the form of speculative argument from appellants' counsel on appeal, later adopted by the appeals court in analyzing the issue. Again in his response to the State's petition for discretionary review, appellant underscores the point that the appeals court opinion was based upon the *"likelihood* that the defense attorney *could have, would have* and *should have"* advanced evidence and arguments advantageous to each defendant but did not do so because of the multiple representation problem. (Emphasis added). Later appellants' attorney advises us, because the appeals court studied the record thoroughly, that "whatever deficiency, if any, in the particular reasoning of the court of appeals should not be taken too seriously.... It's difficult to recognize conflicts of interest, like obscenity, but ... one can recognize it when he sees it."

While the analogy may be engaging and perhaps correct, our obligation is precisely to review the decision of the court below to determine whether any such "deficiency" exists. Analysis of the authority cited by appellant and the Court of Appeals, along with other cases from this Court, enforces our conclusion that the appeals court erred in analyzing the conflict issue.

In *Ex parte Parham*, supra, the trial attorney for two brothers charged with murder later testified that an actual conflict arose during their trial because he could have called the brother who did the shooting to the stand to exculpate the other by proving that only one was involved in the murder. We held that the attorney's "divided loyalties" resulted in ineffective assistance of counsel.

In *Gonzales v. State*, supra, the trial attorney called one of three defendant's to the stand in an attempt to rebut the State's version of events. The "strategy" backfired, with the testimony inculpating the other two defendants. In reversing the conviction, this Court said:

"We have no trouble perceiving how [co-defendant] 'could have [stood] to gain significantly' by taking the stand and advancing 'plausible arguments and adducing probative evidence that were damaging to the cause of a co-defendant' (citation omitted). What began as a foreseeable conflict of interest became an actual conflict of interest as far as appellant is concerned as he was impelled to sit mute while [co-defendant] painted an extremely damaging portrait of his involvement in this offense filling in the gaps left by the State on the canvas." *Gonzales v. State*, supra, at 283.

The more recent case of *Ex parte McCormick*, supra, also provides an example of "strategy" gone sour: where a potential conflict became an actual conflict in interest. Two trial attorneys there represented the same two defendants accused of murder. Defense strategy was to show that defendant McCormick only gave his confession after being promised the State would not seek the death penalty, then show that defendant McMahan only confessed after McCormick's statement was used as leverage against him. To this end the defendant successfully fought the State's motion for severance of trials. However, the State chose to introduce only McMahan's confession. Appellant McCormick was harmed in two ways: he effectively lost his right of confrontation after severance was defeated, and during final argument defense counsel refrained from plausibly arguing the weaker case, sans confession, against McCormick, in fear of weakening co-defendant McMahan's chances with the jury. See *Ex parte McCormick*, supra; see also *Ex parte Acosta*, supra; and *Ex parte Alaniz*, supra.

In each of these cases the potential for conflict inherent in multiple representation became an actual conflict due to the inculpatory or exculpatory nature of testimony or the strategy adopted by defense counsel in the particular case. That is not reflected in the case before us today. Each appellant had a distinct alibi supported, albeit sometimes weakly, by separate witnesses. Each appellant testified, in effect bolstering both alibi defenses. There is no conflict between the testimony of these appellants, the testimony in effect bolstering an individual appellant's own defense, a poten-

tial conflict does not rise to the level of an actual conflict of interest. *Almanzar v. State,* supra. In line with this, we hold that the testimony between alibi witnesses for appellants in no way conflicted with either defense, and an actual conflict of interest has not been shown.

The appeals court opinion is predicated upon the unfounded presumption that either appellant "could have" or "would have" conducted or countenanced a different defense from the one undertaken. After careful examination of the record, we are unable to agree with this conclusion. "Potential" conflicts may indeed become "actual" conflicts of interest during the course of a criminal proceeding, but the transformation must be firmly based upon changes in the particular case without regard to speculative, hindsight analysis of an attorney's strategy. While appellant may be correct in his argument that two alibis are hard to "sell" to a single jury, we cannot say that two defendants, both asserting total innocence, who make no effort to incriminate the other, may not be tried together. Under the circumstances of this case, potential conflicts of interest never became "actual, significant" conflicts of a type denying appellants their right to effective assistance of counsel. *Cuyler v. Sullivan,* supra.

Moreover, even though we find that no actual, significant conflicts of interest arose in the joint representation of appellants, review of the entire record reflects that appellants were placed on notice of potential conflicts of interest as between them, but decided after family discussions with counsel to proceed in a joint trial. Although not bound to do so, we accept the findings and conclusions of the trial court in this matter. *Ex parte Reed,* 610 S.W.2d 495 (Tex.Cr.App.1981); see *Ex parte Ramirez,* 577 S.W.2d 261 (Tex.Cr.App.1979); *Ex parte Williams,* 561 S.W.2d 1 (Tex.Cr. App.1978).

The decision of the Court of Appeals is reversed and the cause remanded to that court for consideration of appellants' other points of error.

TEAGUE, J., concurs in the result.

CLINTON, Judge, concurring.

We deal here with a claim of ineffective assistance of counsel on account of alleged conflicting interests, thereby implicating a certain basic duty inherent in representing a criminally accused client, *viz:*

> "... Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interests."

*Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

For years the Supreme Court of the United States has insisted that inherent in "the 'Assistance of Counsel for his defense' guaranteed by the Sixth Amendment" to a criminally accused is "his right to 'conflict-free' counsel." *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942). Furthermore, it has suggested some "suspect" situations conducive to denying that right, *viz:*

> "... Joint representation of conflicting interests is suspect because of what it *tends to prevent the attorney from doing.* For example, [it may preclude exploring a plea bargain agreement]. Generally speaking, a conflict may also prevent and attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another. *Examples can be readily multiplied.* The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters."

*Holloway v. Arkansas,* 435 U.S. 475, at 489–490, 98 S.Ct. 1173, at 1181, 55 L.Ed.2d 426, at 438 (1978).[1]

---

1. All emphasis throughout this opinion is mine unless otherwise noted.

In *Holloway v. Arkansas*, supra, the Supreme Court declined to resolve divergent approaches taken by lower courts to two issues commonly raised in challenges to joint representation, towit: first, how certain and strong a conflict must be to constitute deprivation of effective assistance of counsel; second, the scope and nature of an affirmative duty of the trial judge to assure there is no such deprivation. *Id.*, at 483–484, 98 S.Ct., at 1178. Our immediate concern here is with the first issue.

From a constitutional standpoint the Supreme Court now differentiates two situations: one, where an objecting accused (or counsel) demonstrates that *"potential* conflicts" in multiple representation "impermissibly imperil his right to a fair trial," thus creating the presumption that "the possibility of conflict has resulted in ineffective assistance of counsel;" the other, where a nonobjecting accused demonstrates that "an *actual* conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). Compare, as it did, *Glasser v. United States*, 315 U.S. 60, 72–75, 62 S.Ct. 457, 465–467, 86 L.Ed. 680 (1942), with *Dukes v. Warden*, 406 U.S. 250, 256, 92 S.Ct. 1551, 1554, 32 L.Ed.2d 45 (1972). *Id.*,

446 U.S., at 348–349, 100 S.Ct., at 1718–1719.

Three times in *Cuyler v. Sullivan*, supra, the Supreme Court stated in similar terms that a nonobjecting accused must demonstrate that "an *actual* conflict of interest" adversely affected performance of his attorney: *id.*, at 348, 349 and 350, 100 S.Ct., at 1718 and 1719; accord: *Strickland v. Washington*, supra, 466 U.S., at 692, 104 S.Ct., at 2067. Contrary to what the majority opinion indicates at page 782, the *Cuyler* Court never mentioned " 'actual, *significant* ' conflicts." [2] Clearly the proper legal test requires finding no more than an actual conflict of interest.[3]

In the opinions discussed *ante* the Supreme Court provides examples aplenty of conflicts of interests, but there is a dearth of instances found to constitute an "actual conflict." [4] Some decisions regard *Glasser v. United States* as a reliable benchmark. See, e.g., *Cuyler v. Sullivan*, supra, *viz:*

" ... The record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked Glasser with the crime and failed to resist the presentation of arguably inadmissible evidence. [*Glasser*, 315 U.S. at 72–75, 62 S.Ct. at 465–467]. The Court found that both omissions resulted from

---

**2.** The insertion of "significant" by this Court probably first appears in *Ex parte Alaniz*, 583 S.W.2d 380 (Tex.Cr.App.1979)—delivered something more than a year before *Cuyler v. Sullivan*. In a footnote to a textual recitation that petitioner complained of "a conflict of interest on the part of his retained attorney," the late Judge W.T. Phillips wrote:

"An actual and *significant* conflict of interest exists when 'one defendant stands to gain *significantly* by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a codefendant whom counsel is also representing.' *Foxworth v. Wainwright*, 516 F.2d 1072 at 1076 (5th Cir.1975); *U.S. v. Huntley*, 535 F.2d 1400 (5th Cir.1976)."

*Id.*, n. 3, at 381. The internally quoted language is from the *Foxworth* opinion; having qualified "gain" with "significantly," in note 7, at 1077, the *Foxworth* Court converted that notion into "an actual, significant conflict" to contrast a conflict that is "irrelevant or merely hypothetical." *U.S. v. Huntley*, supra, at 1406, faithfully follows *Foxworth*.

Again, both opinions preceded *Cuyler v. Sullivan*, which requires just that a conflict be "actual."

**3.** Indeed, the Supreme Court did not undertake to determine whether the asserted conflict was "actual." Because there were competing evidentiary contentions by the parties which the Court of Appeals did not weigh "under the proper legal standard," it vacated the judgment and remanded the cause for further proceedings consistent with its opinion. *Id.*, 446 U.S., at 350, 100 S.Ct. at 1719.

**4.** See, e.g., *Wood v. Georgia*, 450 U.S. 261, at 272, 101 S.Ct. 1097, at 1104, 67 L.Ed.2d 220 (1981) (because record demonstrates "the *possibility* of a conflict of interest," cause remanded for further hearing [emphasis in original] ); cf. *Burger v. Kemp*, 483 U.S. ——, 107 S.Ct. 3114, at 3120–3121, 97 L.Ed.2d 638 (1987) (actual conflict not identified where one lawyer represented a coindictee and his partner represented the other in separate trials).

counsel's desire to diminish the jury's perception of a codefendant's guilt."

*Id.,* 446 U.S., at 348–349, 100 S.Ct., at 1718.[5]

In contrast is *Dukes v. Warden,* 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972), the facts of which the *Cuyler* Court briefly summarized, *viz:*

"... Dukes pleaded guilty on the advice of two lawyers [separately but from the same firm], one of whom also represented Dukes' codefendants on an unrelated charge. Dukes later learned that this lawyer had sought leniency for the codefendants by arguing that their cooperation with the police induced Dukes to pled guilty [and also that they "came under the influence of Dukes and got involved"]."

*Id.,* 446 U.S., at 349, 100 S.Ct., at 1718–1719. Rejecting a contention that "his lawyer's conflict of interest infected his plea," the Supreme Court agreed with an essential finding by the Connecticut Supreme Court, *viz:*

"There is nothing in the record before us which would indicate that the alleged conflict resulted in ineffective assistance of counsel and did in fact render the plea in question involuntary and unintelligent."

Therefore, "Dukes did not identify an *actual* lapse in representation." *Id.,* at 349, 100 S.Ct., at 1719.[6]

Thus the recurring theme throughout germane Supreme Court decisions is that a possible conflict of interest becomes an "actual conflict of interest" in representation when manifested by identifiable active or passive behavior on the part of counsel that is unfavorable to interests of his client. We should so hold.

As thus understood, I agree the Houston (1st) Court of Appeals did not find an "actual conflict of interest," but in resolving the issue the majority opinion of this Court is often gratuitously presumptuous and terribly ambiguous.[7]

---

5. More specifically, the *Glasser* Court analyzed the first failing as follows:

"Brantman [witness who implicated codefendant Kretske in accepting a bribe on behalf of one Abosketes, and testified he did not know Glasser, but was not then crossexamined by counsel] was re-called three days later. Stewart [counsel for both Glasser and Kretske] declined cross-examination. That this decision was influenced by a desire to protect Kretske can be reasonably inferred from the colloquy between the court and Stewart before sentence was imposed. At that time Stewart told the court that, lest his failure to cross-examine Brantman reflect on Kretske, the reason for his forbearance was that he feared that Brantman would tell worse lies. But, especially after the intervening testimony of Abosketes [to the effect that he paid money because Glasser and Brantman were linked together in the deal], a thorough cross-examination was indicated in Glasser's interest to fully develop Brantman's lack of reference to, or knowledge of, Glasser. Stewart's failure to undertake such a cross-examination luminates the cross-purposes under which he was laboring."

315 U.S., at 73, 62 S.Ct., at 466.

6. In explication the Connecticut Supreme Court pointed out, *inter alia:*

"... [It does not appear that either attorney] induced [Dukes] to plead guilty in furtherance of a plan to obtain more favorable consideration from the court for other clients."

*Dukes v. Warden,* supra, 406 U.S., at 257, 92 S.Ct., at 1554.

7. Apart from curious notions that potential conflicts may be avoided by one accused foregoing his defense or each being "willing to accuse the other of nefarious conduct" (At 780), the core of the majority view is at page 782, *viz:*

"... 'Potential' conflicts may indeed become 'actual' conflicts of interest during the course of a criminal proceeding, but the transformation must be firmly based on changes in the particular case without regard to speculative, hindsight analysis of an attorney's strategy."

No Supreme Court decision coming to my attention indicates that "trial strategy" of counsel is an irrelevant consideration in determining *existence* of an actual conflict of interest. "Since a possible conflict inheres in almost every instance of multiple representation," *Cuyler v. Sullivan,* supra [446 U.S.] at 348, [100] S.Ct., at 1718," by its very nature potential conflict is preexisting condition to selection of strategies and defenses, and the risk is that the former may unduly influence choosing or manifestly impair executing the latter. See *Foxworth v. Wainwright,* supra, at 1079–1080. That an accused acquiesced in joint representation will not justify "an actual conflict of interest adversely affect[ing] his lawyer's performance." *Cuyler v. Sullivan,* supra 466 U.S., at 348, 100 S.Ct., at 1718.

Accordingly, while I do not join the opinion of the Court, I concur in its judgment.