NO. 07-04-0119-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

DECEMBER 15, 2005

_____

TROY MONTGOMERY EISENMAN, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 84ᵗʰ DISTRICT COURT OF OCHILTREE COUNTY;

NO.  3784; HON. WILLIAM D. SMITH, PRESIDING

_____

Before QUINN, C.J., REAVIS, J., and BOYD, S.J.[1]

<u>OPINION</u>

In two points of error, appellant Troy Montgomery Eisenman seeks reversal of his conviction of aggravated assault with a deadly weapon upon David Eisenman, as well as the resulting judge-assessed punishment of ten years confinement in the Institutional Division of the Department of Criminal Justice.  In those points, appellant argues that his trial counsel was ineffective in that: 1) he failed to properly investigate the case and present

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 2005).

a viable defense, and 2) he failed to resolve the conflict that existed because his trial counsel had previously represented the victim in this case. We affirm the judgment of the trial court.

The nature of appellant's ineffective assistance of counsel claim requires us to review the trial testimony in some detail. The state's first witness was Jamie Risewig. Ms. Risewig testified that she had lived with appellant about nine months at the time of her testimony. At the time of the offense, on January 22, 2003, she had just moved in with appellant. She averred that twice that day, the victim David Eisenman (David) had been over to appellant's residence, once in the morning and once in the late evening. She said that she, David, and appellant had been drinking heavily that day and were all intoxicated.

That evening, when David came to appellant's residence, appellant admitted David to the house and gave him a beer. Initially, she said, the pair talked for awhile in the living room and were getting along "so-so." She went in the kitchen, and while she was in there heard a loud argument. She came out of the kitchen and, she said, as she did so, she saw David bending over and appellant with a bat in his hand. She opined that appellant had hit David although she admitted she did not actually see him do so. When asked by the prosecutor if she had not in the past told the investigating officer that she had been in the bathroom and, when she came out, she saw appellant hit David with the baseball bat, she denied it. However, a videotape of a statement she made to the investigating officer was shown.

After the videotape was shown, Ms. Risewig admitted that she had told the investigating officer as she came out of the bathroom, she had seen appellant hit David one time, and that David was then on his knees and bleeding from his head. She also said that

2

"to her knowledge" appellant had struck David with the bat before she came out. She did not see David with any weapon.

Under cross-examination by defense counsel, she said she had seen David three times the day of the occurrence. The first time was in the morning when he was so drunk that he passed out on the couch. She averred that David was belligerent, rude, and cussing that morning. In the afternoon, she and appellant saw David at his aunt's house and, she said, he was drunker than he had been that morning, and he was still cussing and being belligerent and rude. David told them that he had been drinking about three or four days.

Catina Brock testified that she was David's girlfriend. On the night of the occurrence, she said, she went to appellant's residence looking for David. As she approached the front door of the residence, she heard "yelling and like breaking and things." Seeing that the front door was partially open, she entered the house. As she did so, she saw David on his knees bleeding from his head. There was blood on the floor and David was covered in blood. She saw appellant with a baseball bat and, she averred, "Troy drew back, hit David on the head and it grounged [sic] down and hit him on the shoulder." She averred that she saw appellant hit David several times with the bat and then, he started "hitting things. . . [c]offee table, anything in the house. " Brock told appellant that if he would calm down, she would get David out of the house. Appellant did so, and Brock, with the assistance of Ronnie Eisenman, removed David from the house.

Upon cross-examination, Brock said that David had been at her house before he went over to appellant's house. When she went to appellant's house, she noticed that he too was drunk. She recollected a prior occasion when the police had to be called because

3

David was drunk. However, that was over a year before. She also said that the relationship between David and appellant was good when they were sober.

David took the stand and testified that he was appellant's cousin and had worked for him once before. He acknowledged that their relationship might be characterized as "fighting cousins" and their disagreements included both verbal and physical confrontations. Although he admitted passing out at appellant's house, he averred that incident occurred the day before the occurrence giving rise to this prosecution. On the day in question, he said he went over to appellant's house three times. The first time, he averred, was to socialize and to ask about a job, and appellant offered him a job. He had not been drinking at that time. David admitted that he drank too much and on a regular basis. David also admitted that he had "violated the law quite a bit growing up" and that at the time of his testimony, he was in jail awaiting transportation to the Department of Criminal Justice and had been confined there before.

The second time he went to appellant's house on the day in question was in mid-afternoon and was again to see about a job. He admitted that he had had over a six-pack of beer by that time and that he and appellant got along fine then. He left there and went over to his aunt's house. At that time, he was drunk and "maybe" obnoxious. He and the others there were all drunk and were "cussing some" but there were no physical confrontations. He was at that place about an hour or an hour and a half and then went home.

While he was at home, he received a call from another individual which caused him to change his mind about going to work for appellant. He continued to drink until later that evening when he returned to appellant's house. At that time, he, appellant, and Ms.

4

Risewig were all drunk. Appellant offered him a beer and David told him that he had been offered another job and he was going to take that job instead of the one appellant had offered him. Then, he said, appellant "just blew up," and accused him of not taking the job because of his girlfriend's influence. He and appellant were so close to each other during that exchange that appellant's saliva was hitting him in the face.

David averred that appellant then used an expletive, got his baseball bat from another room, used another expletive in telling David to get out of his house, started swinging the bat and hit David on the arm twice and on the head. After that last blow, David did not remember anything until he awoke in an Amarillo hospital. David denied that he ever had a weapon during the occurrence or that he ever attempted to strike appellant. He admitted that he had pushed appellant when appellant spit on him and that was when appellant got the bat.

Under cross-examination, David admitted that he had been drinking for at least two days prior to the occurrence and that he had consumed around 36 beers during that time. He acknowledged that at the time of the alleged assault, he had been on a three-day drinking binge. In describing the incident to the defense attorney, David asserted that appellant got mad about David not going to work for him. After appellant did so, he said the pair was face-to-face, almost chest-to-chest. David said "when Troy [appellant] went to slobbering on me, I jarred him back." As he did so, he said, appellant went back a step which irritated him. Appellant then went into his plant room, grabbed the bat, and "that's when all the altercation started." He averred that the incident was caused by both of them being intoxicated and the fact that he was not going to work for appellant. He said there was no bad blood between the two prior to the altercation and that after the incident and

5

he got out of the hospital, he went back to work for appellant or took his place on a job. As a result of the encounter, he said he still had some back problems and some impairment of hearing.

Dr. Claude Betty, a physician, testified about David's injuries and that in the manner of the use of the bat, it was capable of causing death or serious bodily injury. Perryton police sergeant Mike Smith testified that he was the officer who first responded to the call concerning the occurrence. He went to appellant's house and observed that he was "highly intoxicated" as was Ms. Risewig. The officer went to appellant's residence and talked to appellant "less than four minutes" after which he took Ms. Risewig to his patrol car to talk to her away from appellant and did so for some eight minutes. Ms. Risewig never told him that David broke into the house or had threatened appellant although David was "running his mouth."

Smith then returned to appellant's residence to talk to appellant but he was passed out in front of the house's fireplace. He attempted to rouse appellant but was unsuccessful. The officer said that when he initially talked to appellant he was "very excited, very mad." Appellant never said that David broke into his house, threatened him, or struck him. Appellant also told the officer something to the effect that he was glad that David was in an ambulance and that he may have had something to do with it and that if David didn't "die tonight, I'm going to find him and that's it." Upon cross-examination, the officer said that appellant's comments were "probably some of his intoxication, some of his anger." He said that appellant was belligerent with him at times when he talked to him. After Smith's testimony, the State rested.

As his first witness, appellant called his cousin, Greg Eisenman (Greg). Greg testified that the day before the incident giving rise to this prosecution, David came to his business drinking a quart of beer and being loud. When Greg told David he could not drink in his business, David argued with him. Greg averred that David and appellant had had fights their whole lives. They would fight and then make up. Greg said that David had been drinking, loud, and obnoxious Greg's whole life since David was old enough to drink.

Appellant's second witness was his mother, Mary Eisenman (Mary), who was also David's aunt. She testified that on the day of the incident in question, David came to her house drunk and in possession of alcoholic beverages. When she told him to get the alcohol out of her house, David argued with her. David also started bragging about how he had killed a "snitch" which upset her. Eventually, appellant, who was also present at the time, told David to leave the house. She opined that David was intoxicated, belligerent, and very rude as he always was when he was drinking. Mary also remembered a time when David broke into appellant's house and assaulted him. She said that every time that David was around he caused trouble for "whoever was there."

Ronnie Eisenman (Ronnie), appellant's brother, was his next witness. David came to his house on the day of the assault just as he was leaving to go to Mary's house. Ronnie knew that David had been drinking and did not want David to go with him to Mary's house because it upset Mary when David had been drinking. However, when David promised to be quiet, Ronnie let David go with him. After they arrived, violating his promise to be quiet, David, drunk that day as well as the preceding day, loudly bragged that he had killed a "snitch" and would kill another, and it wouldn't bother him at all. Ronnie admitted that he

7

was on probation for a felony DWI offense himself. He left Mary's house with David and took him to a place "where they get drugs."

When Ronnie saw David later that night, David was even more intoxicated. David told Ronnie that he was going over to appellant's house. Ronnie said that he told David not to go over to appellant's house because there would be trouble if he did so. Later that night, David came back to Ronnie's house all bloody, and asked why appellant would do "that." Ronnie drove David and his girlfriend to the hospital. Ronnie also averred that David broke into appellant's house about two years ago and assaulted appellant. After David got out of the hospital, he came back over to appellant's house and helped him build a fence as if nothing had happened. It was Ronnie's opinion that on the day of the occurrence that David just kept getting drunker and he "was doing alcohol and drugs, so like he knew he was going to prison and he was partying up before he got put in jail."

When cross-examined by the State, Ronnie said that Dr. Betty did not want to look at any member of the Eisenman family because "my mother had sued Dr. Betty" although he did not know what injuries Dr. Betty had testified to. He admitted that all the members of the family, including himself, were heavy drinkers. Under re-direct examination by appellant's counsel, Ronnie estimated that David had been intoxicated at least 60 per cent of the time.

Appellant's mother was recalled by appellant and testified about another time David had come to appellant's house and assaulted appellant. She requested that David leave appellant's house but David refused to do so and it was necessary to call the police to remove him. Appellant also recalled Jamie Risewig who testified that appellant was trying

8

to get David to leave his house at the time of the incident and that David was drunk and verbally abusive to both her and appellant.

The litany of axiomatic guidelines to be followed in the determination of ineffective assistance of counsel claims as well as the authorities mandating those guidelines are set out in the seminal case of *Garcia v. State*, 57 S.W.3d 436 (Tex. Crim. App. 2001), *cert. denied,* 537 U.S. 1195, 123 S.Ct. 1351, 154 L.Ed.2d 1030 (2003). As explicated in that case, the Sixth Amendment to the Federal Constitution guarantees the right to reasonably effective assistance of counsel in state criminal prosecutions. In general, to obtain a reversal of a conviction on the ground of ineffective assistance of counsel, an appellant must demonstrate that: 1) defense counsel's performance fell below an objective standard of reasonableness, and 2) there is a reasonable probability that but for counsel's error(s), the result of the proceeding would have been different. *Id.* at 440. In assessing a claim of ineffective assistance, an appellate court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, that is, the appellant must overcome the presumption that under the circumstances, the challenged action might be considered sound trial strategy. *Id.* Also, in the absence of evidence of counsel's reasons for the challenged conduct, an appellate court commonly will assume a strategic motivation if any can possibly be imagined and it will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it. *Id.* Finally, an appellant's failure to satisfy one prong of the twofold test negates a court's need to consider the other prong. *Id.*

Counsel may be ineffective when operating under a conflict of interest. *Barbaro v. State*, 115 S.W.3d 799, 801 (Tex. App.–Amarillo 2003, pet. ref'd). However, until the accused shows his attorney is, or was, actively representing such interests, and that actual conflict of interest adversely affected counsel's performance, he has not established the predicate for a claim of ineffective assistance. *Id.; Nethery v. State*, 29 S.W.3d 178, 188 (Tex. App. –Dallas 2000, pet. ref'd). Additionally, the conflict must be actual, as opposed to speculative or potential. *James v. State*, 763 S.W.2d 776, 781-82 (Tex. Crim. App. 1989); *Thompson v. State*, 94 S.W.3d 11, 16 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd). An actual conflict of interest exists if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (including his own), to the detriment of his client's interest. *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997). Moreover, in the absence of some showing that a potential conflict of interest became an actual conflict of interest, a reviewing court will not speculate about a strategy an attorney might have pursued but for the existence of the potential conflict of interest. *Routier v. State*, 112 S.W.3d 554, 585 (Tex. Crim. App. 2003), *cert. denied,* 541 U.S. 1040, 124 S.Ct. 2157, 158 L.Ed.2d 728 (2004). Parenthetically, the test for ineffective assistance of counsel is the same under both the federal and state constitutions. *Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986).

The gist of appellant's first point challenge is that his trial attorney was ineffective because he failed to discover and call to testify as witnesses Alvino and Cristina Quintana and Tonya McNeeley, whom he characterizes as neutral witnesses. He argues that they would have provided additional evidence of David's drunken and abusive behavior towards

10

appellant and others and this would have bolstered appellant's self-defense claim. The Quintanas were neighbors of appellant and Tonya McNeeley was a local tavern owner.

At the new trial hearing, the trial judge took judicial notice of the affidavits of these witnesses. In their affidavits, the Quintanas averred that they were appellant's neighbors. They said that David would knock on appellant's door at all hours of the day and night and would become abusive if appellant would not answer the door. At other times, David would drive by appellant's house and cuss and scream. They also said that David was always drunk and causing problems for appellant. Alvino said that, in his opinion, appellant had just gotten to the point that he could not take David's behavior towards him anymore. Both the Quintanas said they had not been contacted about testifying, and Alvino said he would have been willing to do so.

At the hearing, the trial court also considered the affidavit of Ted Campos, a private investigator. In the affidavit, Campos averred that he had talked to Tonya McNeeley, who was the manager of Our Place Bar in Perryton. She told the investigator that David had a reputation for being a troublemaker and brawler to the extent that she had banned him from her bar. She also told Campos that David and his girlfriend had been kicked out of her bar for fighting with each other and that they were later arrested at their home.

Appellant also testified at the new trial hearing. He said that he had reviewed the affidavits of the Quintanas and had been unaware of what they knew. He also said that he had made his trial attorney aware of specific instances in which David had attacked him and others and told the attorney of David's reputation in the community. Appellant understood that his trial attorney had also represented David in another matter and that he had told the attorney this concerned him but that the attorney told him that was no problem.

11

Although appellant said that he did not believe that this was brought up at trial, under cross-examination, he admitted that his mother and his two brothers had testified at trial about various incidents and as to David's character for being aggressive and obnoxious when drunk.

At the hearing, the State produced the affidavit of appellant's trial attorney. In that affidavit, the attorney said the prosecutor told the jury that David had an extensive criminal record, that David was obnoxious, aggressive, and violent when drunk, and that on the night of the incident, David was drunk. He also produced evidence to that effect during the trial, and we have listed some of that evidence above. The attorney states in the affidavit his conclusion that the relationship between David and appellant was fully developed at the trial and additional evidence of David's character traits or propensity for violence would have been merely cumulative and corroborative.

Our review of the extensive evidence produced at the trial concerning David's drinking habits and his activities while he was drinking convinces us that the trial court was justified in concluding that the additional evidence was cumulative in nature and that it would not likely have produced a different result had it been produced at trial. Trial counsel's performance in that regard did not fall below an objective standard of reasonableness. Appellant's first point is overruled.

In connection with appellant's conflict of interest point, the record does not show that the trial court reversibly erred in its evident conclusion that no actual conflict of interest existed that adversely affected trial counsel's performance at trial or his ability to properly defend appellant. Appellant's second point is overruled.

In sum, both of appellant's points of error are overruled, and the judgment of the trial court is affirmed.

John T. Boyd
Senior Justice

Do not publish.