In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00172-CR
NO. 09-17-00173-CR
NO. 09-17-00174-CR
NO. 09-17-00175-CR
NO. 09-17-00176-CR

_____

KATHLEEN ELAINA HOFFMAN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 1
Montgomery County, Texas
Trial Cause Nos. 15-307436, 15-307424, 15-307421, 15-307044, 15-307043

MEMORANDUM OPINION

The State charged Kathleen Elaina Hoffman (Kathleen) in five separate

causes of cruelty to livestock animals, alleging she failed to provide necessary food,

1

water, or care arising out of her treatment of over two hundred horses.[1,2] *See* Tex. Penal Code Ann. § 42.09(a)(2) (West 2016). A jury convicted Kathleen in all five causes. *See id.* The trial judge assessed punishment of one year in the Montgomery County Jail for each case, to be served concurrently, and a $4,000 fine in each case. Kathleen's sentence was suspended, and she was placed on community supervision for eighteen months. Kathleen appeals her convictions.

In four issues, Kathleen argues: (1) the judgments should be reversed for a new trial with separate trial counsel because appellants' trial counsel was ineffective; (2) the judgments should be reversed based on *Brady* and Michael Morton Act violations; (3) the judgments should be reversed and an acquittal entered because the evidence is factually insufficient in each case; and (4) the judgments should be reversed and dismissed with prejudice because appellants were prosecuted twice for the same offenses violating the Double Jeopardy Clauses of the United States and Texas Constitutions. We overrule all issues and affirm the trial court's judgment.

---

[1] Her husband, Herman Hoffman, was also charged and convicted for cruelty to livestock animals arising out of the same instances. They were tried together and filed a joint brief raising identical issues on appeal. We address Herman Hoffman's appeal in a separate opinion.

[2] Mrs. Hoffman and her husband were initially charged with twenty separate counts of cruelty to livestock animals by failing to provide necessary food, water, or care; however, the State proceeded with five counts for purposes of expediency.

## I. Factual Background

The State seized 207 horses from Kathleen and Herman Hoffman. Before the criminal prosecution, the Hoffmans were subject to civil forfeiture proceedings in Justice Court, which judgment was appealed to the County Court at Law for a trial *de novo* pursuant to Texas Health and Safety Code section 821.025. *See* Tex. Health & Safety Code Ann. §§ 821.023, 821.025 (West Supp. 2018).[3] The Justice Court determined they treated all seized animals cruelly, ordered the animals surrendered, and ordered the Hoffmans to pay $150,000.00 for costs associated with the care of the animals. The County Court at Law issued almost identical findings but ordered the Hoffmans to pay $485,331.68 in costs incurred by the SPCA for housing and caring for the animals. The Hoffmans were subsequently prosecuted together and convicted in five causes each of the criminal offense of cruelty to livestock animals under Texas Penal Code section 42.09(a)(2). *See* Tex. Penal Code § 42.09(a)(2). The criminal convictions are the basis of these appeals.

The Hoffmans resided at property on League Line Road in Montgomery County, Texas. Kathleen and her husband owned around fifteen acres and leased an additional twenty-five acres adjacent to their property, or around forty acres

---

[3] We cite the current version of the statute as it does not affect the outcome of these appeals.

altogether. In addition to 207 horses,[4] the Hoffmans kept dairy cows and goats on the forty acres.[5]

Kathleen testified she spent most of her life around horses as her family raised horses. On cross-examination, she confirmed she was almost an expert in horse care, and she knew how much she needed to feed the horses for them to be healthy.

A deputy constable from the livestock division, Gordon Welch, indicated his department began receiving complaints about the body weight and living conditions of the Hoffmans' horses in 2014.[6] Between 2014 and June 2015, the deputy constables received and responded to many complaints regarding the Hoffmans' horses. Welch testified they gave the Hoffmans recommendations for improving the horses' condition by "stepping up" the feeding program and ensuring they wormed the horses. The deputy suggested Kathleen and Herman were both in control of the horses, and the recommendations were directed to them both. The deputy constables assigned to the livestock division worked with the Hoffmans for several months

---

[4] State's Exhibit 233 was a video played for the jury in which Herman Hoffman estimated they had 190 horses on the property, fifty cows, and twenty goats.

[5] None of the Hoffmans' other animals were seized.

[6] Deputy Welch testified he met the Hoffmans approximately five years prior to trial when one of their bulls escaped. At the time, the Hoffmans gave Deputy Welch a tour of their property where Welch observed eighty to one hundred horses in good health.

before issuing a warning on October 10, 2014. Deputy Welch circled the definition of cruelty indicating "fails unreasonably to provide necessary food, water, or care for a livestock animal in the person's custody" on the written warning and directed the Hoffmans to seek medical assistance for the horses from a licensed veterinarian. Welch wanted a vet to examine the animals and make recommendations because he felt the Hoffmans' feeding program was inadequate due to the large number of horses in the pens, and the weaker horses were not able to get adequate feed.

According to Welch, veterinarian Dr. David Husfeld visited the Hoffmans' property and evaluated the horses. Dr. Husfeld opined in a letter dated October 27, 2014, the "condition of this group of horses ranges from [] good to very bad." Dr. Husfeld suggested the remedy was "more and better feeding" along with a "good parasite control program[.]" Dr. Husfeld also suggested "the thinner animals ideally need to be separated to [feed.]"

The deputy constables received more complaints about the horses' condition and made additional visits to the Hoffmans' property where they observed a further decline of the animals. On June 23, 2015, Deputy Welch, his partner, and an investigator with the District Attorney's office went to the Hoffmans' property. Based on their visual observations, they obtained a search warrant for the property

5

on June 24, 2015. As a result of those findings, they also secured and executed a seizure warrant.

At trial, several witnesses who participated in the seizure described the deplorable conditions. The participating Society for the Prevention of Cruelty to Animals (SPCA) barn supervisor testified her first impression of the property was it appeared to be a "kill pen." She also observed many skinny, distressed horses. The SPCA barn supervisor also testified there was no grass for the horses and no place for them to graze.

Because of the large number of animals and the logistics of dealing with a seizure of that magnitude, Montgomery County required help from the SPCA. Deputy Welch and other State witnesses suggested the Hoffmans' horses were unaccustomed to handling, so it took around two weeks to round them up, give them medical treatment, worm them, and transport them to another location. The SPCA barn supervisor assisting with the seizure described horses with rain rot[7], bones showing, and overgrown hooves.

Dr. Amy Crum, an SPCA veterinarian, went to the Hoffman property to assess the overall situation and triage horses in need of emergency veterinary care. Dr. Crum testified her initial impression of the herd was they were in very poor condition

---

[7] "Rain rot" is an infection of the skin.

6

with nutritional and hoof care problems, respiratory disease, infected wounds, and many other issues. Dr. Crum testified she was concerned some animals' deaths were imminent, so they removed eighteen of those horses to the Houston SPCA for immediate care. According to Dr. Crum, the horses lacked basic veterinary care and husbandry, nutrition, and foot care—things horse owners should provide. Of the horses requiring emergency veterinary care, several were emaciated and in danger of not being able to support their own weight, while others had debilitating wounds. Dr. Crum explained how they tracked and cared for the seized horses by assigning them a unique six number identification and connected the records by using that number.

State witnesses, including Dr. Crum, discussed how they used the Henneke Body Conditioning Score (BCS) for horses. That scale provides a score ranging from 1 to 9 for evaluating a horse's body condition. A score of 1 means a horse is extremely emaciated, and a score of 9 suggests an obese horse. Dr. Crum and the SPCA barn supervisor testified an ideal BCS is 5.

Several State witnesses discussed appropriate horse care and husbandry standards at trial. These witnesses testified horses required regular hoof care by a farrier, including trimming, and neglecting a horse's hooves could result in laminitis and other permanent lameness. Dr. Crum testified this was particularly important for

confined horses that had no opportunity to run or naturally wear down their hooves. Dr. Crum also testified that horses required regular dental care. Failure to periodically "float" or file down a horse's teeth, results in the teeth growing to sharp points and impeding the animal's ability to eat.

Witnesses testified about the need for a proper parasite control program, and evidence revealed a veterinarian made that recommendation to the Hoffmans before the seizure of the animals. Witnesses also discussed the need to seek prompt veterinary attention for horses with wounds or for animals that collapsed. Evidence established when there is no grass readily available for horses, an owner should regularly feed hay and grain to provide adequate nutrition. Finally, to ensure weaker, thinner animals had an opportunity to feed adequately, evidence showed they should be separated from the rest of the herd.

Montgomery County seized 207 horses. Dr. Crum testified that around twenty-five percent of the Hoffmans' horses were of an adequate weight. The SPCA barn supervisor testified thirty seized horses could not be saved and were euthanized, and three horses died unassisted. Some horses had been adopted, and about eight were available for adoption. Other horses were not ready to be adopted, and the SPCA continued to work with those.

Before trial, the State revealed it was going forward with the criminal prosecutions against the Hoffmans for five of the horses and elected to consolidate the trials of Kathleen and Herman. The criminal trial began on May 15, 2017, and the jury convicted the Hoffmans on all counts on May 18, 2017.

## II. Analysis

### A. Sufficiency of the Evidence

Asserted as Kathleen's third issue, we address her sufficiency complaint first. Kathleen argues the evidence is factually insufficient to support her convictions for cruelty to livestock animals.[8] *See* Tex. Penal Code Ann. § 42.09(a)(2). When an appellant raises a claim of insufficiency, we review the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)) (concluding the *Jackson* standard "is the only standard that a reviewing court should apply" when examining the sufficiency of the evidence);

---

[8] Although Kathleen complains of factual insufficiency, for years, Texas has recognized the legal sufficiency standard as outlined in *Jackson v. Virginia* as the only standard reviewing courts should employ in determining whether the evidence is sufficient to support each element of a criminal offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010).

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We look to "all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999) (citations omitted). The jury is the sole judge of the witnesses' credibility and weight to be given to their testimony. *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Juries may draw multiple reasonable inferences from facts so long as each inference is supported by the evidence presented at trial. *Id.* Accordingly, we must defer to the jury's determinations of weight and credibility of the witnesses. *See Brooks*, 323 S.W.3d at 899; *Hooper*, 214 S.W.3d at 13. In conducting a sufficiency review, an appellate court considers "'events occurring before, during[,] and after the commission of the offense and may rely on actions of the defendant [that] show an understanding and common design to do the prohibited act.'" *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)).

The State was required to prove beyond a reasonable doubt Kathleen intentionally or knowingly failed to provide necessary food, water, or care for each of the livestock animals in her custody listed in the complaints for a jury to find her guilty in all causes. *See* Tex. Penal Code Ann. § 42.09(a)(2). "Necessary food, water, or care" is defined by the statute to mean "food, water, or care provided to the extent

10

required to maintain the livestock animal in a state of good health." Tex. Penal Code Ann. § 42.09(b)(6) (West 2016).

The evidence here was overwhelming that Kathleen and her husband both failed to provide necessary food or care as needed to maintain each of the five horses in good health. *See id.* The Hoffmans focus solely on the evidence of the horses' malnourishment as being insufficient. They argue that without certain blood tests the State cannot establish the animals were malnourished. While we disagree with Kathleen's argument the evidence was insufficient to find the horses were malnourished, there was sufficient evidence about the lack of care for each one of these animals. Veterinary records revealed and testimony at trial supported each of the animals' hooves had been neglected, and they all suffered from parasites. Moreover, four of the animals suffered from significant untreated health problems and wounds.

### 1. Evidence Regarding Horse 287593

Horse 287593 was an older palomino mare. Evidence revealed she was extremely emaciated and had significant dental problems. The State admitted photographs depicting a horse with protruding hip bones, shoulder bones, a sunken face, and vertebrae showing. Evidence revealed the horse had a BCS of 1, indicative of extreme emaciation.

Testimony from the SPCA barn supervisor suggested a horse would not be in poor body condition solely because of its age, and if an older horse was provided with proper nutrition, it should not look skinny. Dr. Crum testified the horse was severely emaciated, suffered from muscle wasting, and completely lacked muscle due to starvation. Dr. Crum testified the horse's dental problems rendered her unable to chew food, and the horse lacked dental care for an extended period. Kathleen and Herman testified the horse had been kicked in the jaw, resulting in broken mandibles years before, and a veterinarian told them to "leave it alone."

Dr. Crum stated the horse was not in good health when seized, did not have adequate food, and had been suffering for months. Testimony and veterinary records revealed the mare had gastrointestinal parasites, particularly strongyle ova, which Dr. Crum testified were easily treatable with over-the-counter medications and a basic part of horse care. Dr. Crum described attempts to provide the mare soft food in the form of mash and intravenous fluids, but even after supporting her with a sling, they could not keep her standing, so she was humanely euthanized.

### 2. Evidence Regarding Horse 287598

The evidence for horse 287598 revealed he had a BCS of 4 and extremely overgrown hooves. Dr. Crum and the SPCA barn supervisor testified the horse's hooves had not been trimmed in a very long time, and the left front hoof was

12

extended into an "elf shoe" shape. Photographs admitted by the State depict the hoof Dr. Crum described. Dr. Crum conveyed this was very abnormal, the hoof was egregiously overgrown, and it took months for the horse's hoof to become so overgrown. Dr. Crum estimated it had been months to years since the horse received farrier care. Dr. Crum also testified an animal kept in a stall requires more hoof care because they do not wear their hooves down naturally. Dr. Crum described the importance of hoof care and if neglected, how a horse's hooves could lead to other serious health problems, including laminitis. The State's evidence and testimony revealed the horse suffered from laminitis. The SPCA barn supervisor testified laminitis stems from a separation of the hoof wall from the coffin bone, which is incredibly painful for the animal. Dr. Crum testified the horse was in pain, as well. In addition to severe hoof problems and lameness, Dr. Crum revealed this horse had parasites, pointy teeth that had not been floated in months, and he had not been fed adequate food. Dr. Crum suggested they euthanized him because of his poor long-term prognosis.

At trial, Herman attributed the horse's overgrown hooves to bad genes and asserted because the horse was lame, he was more comfortable with a long hoof than a short hoof.

### 3. Evidence Regarding Horse 287609

Trial testimony and evidence revealed horse 287609 suffered from a significant wound to a distal limb containing granulation tissue and pus, and the horse had difficulty bearing weight on that limb.[9] Dr. Crum testified the horse suffered from the wound for at least several weeks, and a veterinarian should be involved in the care of a wound that severe. Dr. Crum also testified she would recommend surgical debridement, cleaning, and bandaging before closing the wound. An x-ray of the horse's leg was admitted as State's Exhibit 147. Dr. Crum said the x-ray revealed infection had spread to the bone. This condition limited treatment options going forward, and due to the animal's prolonged suffering, they decided to humanely euthanize it. In addition to the leg wound, the horse had parasites, cracked hooves, and bad teeth. Dr. Crum estimated it had been without proper dental care for months.

### 4. Evidence Regarding Horse 287610

Evidence and testimony revealed horse 287610 had a BCS of 2. State's Exhibits 152 through 156 reveal this animal was extremely emaciated. Dr. Crum testified the horse had gastrointestinal parasites, had not been getting proper food,

---

[9] Evidence suggested the wound was consistent with wire being wrapped around the leg.

and was very weak because he was so emaciated. Dr. Crum suggested horse 287610 was about 400 pounds underweight, and it would take many months for him to become that emaciated. Veterinary records admitted at trial are in accord with this testimony. Dr. Crum stated the horse did not have healthy hooves and was without proper farrier care for at least several months. Dr. Crum testified she did not expect horse 287610 to survive when she first saw him, but they administered intravenous fluids to the horse for several days, and thereafter, he only required basic care and needed to eat.

Testimony revealed this horse collapsed during the seizure after running for twenty or thirty minutes while they sought to load him and was unable to stand until they administered intravenous fluids. Dr. Crum suggested it is an emergency situation when a horse cannot stand.

At trial, Herman contradicted this testimony and claimed people ran the horse for two-and-a-half hours during the seizure. Herman testified the horse had fought, played, and ran with the rest of the herd earlier in the day. Herman also suggested the horse was the dominant male and was always thin.

**5. Evidence Regarding Horse 287611**

The State admitted photographs of horse 287611, a sorrel mare, as Exhibits 166 through 185. The images depict a sorrel mare significantly underweight with

"rain rot." The photographs also reveal several deep wounds and rotting flesh over the horse's left hip. Veterinary records and Dr. Crum's testimony revealed the mare had a BCS of 2 and was severely emaciated. The horse had bad hooves and parasites. Dr. Crum testified the horse had large and chronic lacerations over both her hips draining pus, suggesting they had been there for at least several weeks; the skin was also dying from prolonged infection. Dr. Crum testified a prudent owner should have called a veterinarian to clean appropriately and debride the wound, provide antibiotics and pain management. Dr. Crum conveyed the injuries were painful, and the horse was lame in the rear limbs. Dr. Crum testified the horse was not accustomed to human interaction, would not tolerate restraint, and oral sedatives had little effect. Dr. Crum revealed the horse was euthanized because it was determined to be a danger.

Herman testified horse 287611 was wounded when she became wedged between two trees. Herman contradicted the testimony of Dr. Crum and stated it was protocol to leave the wound like that, and it would have healed in six months. Herman testified there was nothing at all inherently dangerous about the wound.

### 6. Other Evidence

The Hoffmans testified severe weather in the spring of 2015 precluded deliveries of hay and feed to their property. Herman testified horses "take care of

16

themselves[,]" and he did everything he could for the health and welfare of the horses given the circumstances. Kathleen testified she did the same and described the lengths she went to caring for the animals, despite her having serious heart problems.

The Hoffmans both testified they divided the ownership of the animals, where Herman had the horses, and Kathleen owned the cattle. Kathleen testified Herman was the actual owner of the horses in June 2015. Testimony revealed this was done as part of a business arrangement. Ownership is not an element of the offense, however. *See* Tex. Penal Code Ann. § 42.09(a)(2). Rather, the critical inquiry is whether the animal was in the person's custody. *See id.* "Custody" is defined by the statute as including the "responsibility for the health, safety, and welfare of a livestock animal subject to the person's care and control, *regardless of ownership* of the livestock animal." Texas Penal Code Ann. § 42.09(b)(3) (West 2016) (emphasis added). Testimony from employees revealed Herman and Kathleen both had control of the horses. Vicki Henley testified she observed Kathleen heavily involved in the care of the horses and directing employees on how to care for them. Deputy Welch also testified he understood both defendants were in control of the horses.

Of the five horses included in the complaints, only Horse 287610 survived.

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence was sufficient for a reasonable jury to find beyond a reasonable doubt

every element to support the jury's verdict finding Kathleen Hoffman guilty of cruelty to livestock animals for each of the State's complaints. Thus, we overrule her third issue.

## B. Ineffective Assistance of Counsel and *Brady*/Michael Morton Act Violations

We will address Kathleen's first and second issues together, as they were both raised in her motion for new trial.

We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). Likewise, we review a trial court's denial of a motion for mistrial for an abuse of discretion. *See Webb*, 232 S.W.3d at 112; *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). We cannot substitute our judgment for the trial court's; rather, we determine whether the trial court was arbitrary or unreasonable in its decision. *See Holden*, 201 S.W.3d at 763. We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *See Archie*, 221 S.W.3d at 699 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). Mistrial is an extraordinary remedy and only appropriate for highly prejudicial and incurable errors. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).

18

### 1. Ineffective Assistance of Counsel

In her first issue, Kathleen argues she received ineffective assistance of counsel. Her complaints against trial counsel fall into two main categories: (1) failure to obtain additional discovery; and (2) a conflict between Kathleen and her husband rendered the attorney representing them both ineffective.

First, she asserts trial counsel failed to "effectively obtain discovery from the State and its agents[.]" Kathleen points to trial counsel's inability to obtain blood test results, complete records of the seizing agency, the Hoffmans' seized medical and feeding records, and photos taken by witnesses, which would have been favorable evidence for her defense. Kathleen contends that counsel failed to properly enforce court orders to produce documents and he failed to subpoena documents needed for expert analysis or otherwise retain a defense expert. However, our review of the record shows that the discovery requests and subpoenas of which they complain were apparently issued improperly and were subsequently quashed while Kathleen and Herman were defending themselves *pro se*.

Kathleen argues she was more egregiously affected by the ineffective assistance of counsel because of a conflict of interest.[10] Particularly, she asserts on appeal her best defense, considering her debilitating medical condition, would have

---

[10] We note, however, Kathleen and Herman filed a joint brief in this appeal.

19

been to blame her husband for neglect of the horses, but trial counsel failed to assert such a defense. The Hoffmans moved for a new trial. After a hearing, the trial court denied the motion. While trial counsel testified at the hearing, no testimony was elicited from him regarding his trial strategy. At the hearing, the Hoffmans did not subpoena any of the witnesses identified as favorable defense witnesses or provide affidavits to show what each witness would have testified to or introduce records they alleged contained exculpatory evidence.

"An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Ex Parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991)). To establish ineffective assistance of counsel, an appellant must meet a two-pronged test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 726 S.W.2d 53, 55–56 (Tex. Crim. App. 1986). "Unless [an] appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective." *Lopez v.*

*State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *Strickland*, 466 U.S. at 687); *Thompson*, 9 S.W.3d at 813. Allegations of ineffectiveness must be shown in the record, and the record must affirmatively establish the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813. There is a strong presumption counsel's conduct "[fell] within the wide range of reasonable professional assistance[.]" *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (quoting *Strickland*, 466 U.S. at 689); *see also Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

As for a defendant being prejudiced by a trial attorney's deficient performance, courts have explained "[t]o show prejudice, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Jackson*, 877 S.W.2d at 771 (quoting *Strickland*, 466 U.S. at 694).

### a) Discovery

Assuming without deciding that Kathleen has met her burden under the first prong and shown that trial counsel's representation was deficient, Kathleen has failed to meet the requisite second prong. Kathleen focuses on trial counsel's "failure to obtain" certain discovery, including but not limited to records, necropsy reports, witness interviews, blood test results, and other documents. Beyond asserting the

21

foregoing information was necessary to her defense, Kathleen has made no showing that trial counsel's failure to obtain the evidence would have changed the outcome at trial or that it prejudiced her in any way. The Hoffmans complain that the State failed to produce blood test results of each of the five horses which they assert are necessary to accurately assess a BCS score for each horse. The evidence, though, would only go to the weight of the evidence offered by the State's expert witnesses and not to the admissibility of their opinions. The record shows that requested records were produced electronically by the State. The trial court held any information unrelated to the five specific horses at issue was irrelevant. While the SPCA and the State produced requested documentation in their possession or subject to their control, some documentation the Hoffmans requested was shown not to exist. Thus, Kathleen failed to show a different outcome would have resulted. Moreover, although Kathleen claims she was unable to interview certain witnesses, she failed to call any of these witnesses to testify at the hearing on the motion for new trial. So, there was no indication of what they would have testified to at trial, much less whether it would have been favorable to Kathleen. The Hoffmans made no showing that but for counsel's deficient representation, there would have been another outcome at trial. *See id.* The record reveals the Hoffmans conducted much of the discovery *pro se*, and even after the trial court warned them on October 26, 2016, of

22

its intent to set the matter preferentially, they delayed in retaining trial counsel until sometime after January 24, 2017, for a trial that began on May 15, 2017, which would have significantly impacted any attorney's ability to retain experts or pursue additional discovery.

### b) Dual Representation and Conflict

Kathleen and Herman were tried jointly and represented by the same retained counsel.[11] In some situations, the same attorney's representation of multiple defendants in the same trial may constitute ineffective assistance of counsel. *Pina v. State*, 127 S.W.3d 68, 73 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978); *James v. State*, 763 S.W.2d 776, 778 (Tex. Crim. App. 1989)). "However, multiple representation is not per se violative of constitutional guarantees of effective assistance of counsel." *James*, 763 S.W.2d at 778. A defendant who does not object at trial to multiple representation must show actual and not merely speculative conflict of interest before an appellate

---

[11] It has not been lost on this Court that Kathleen and Herman are represented by shared retained appellate counsel. Prior to filing a brief, they moved to consolidate their appeals and subsequently filed a joint brief, which may be viewed as an attempt to invite error by advancing a claim of conflict of interest. Because we find their claim of a conflict of interest to be wholly without merit, the Court opted not to strike the brief for violating Texas Rules of Professional Conduct 1.06, necessitating briefs from new and separate counsel on appeal. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.06, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G., app. A (West 2013).

court will reverse. *Id.* at 778–79; *see also Routier v. State*, 112 S.W.3d 554, 581–82 (Tex. Crim. App. 2003). To prevail on a claim of ineffective assistance based on a conflict of interest, Kathleen must show (1) her counsel was burdened by an actual conflict of interest, and (2) the conflict had an adverse effect on specific instances of counsel's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980); *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997). "[A]n actual conflict of interest exists when 'one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant[.]'" *Routier*, 112 S.W.3d at 584 (quoting *James*, 763 S.W.2d at 779).

Although Kathleen asserts her best defense would have been to blame Herman for neglect of the horses, the existence of a better defense does not rise to the level of an actual conflict. Kathleen and her husband employed the joint trial strategy that elements beyond their control prevented them from getting food to the animals. They argued torrential rains blocked eighteen wheelers from delivering hay and feed to the livestock. They also sought to argue there was nothing wrong with their animals, blaming overgrown hooves on bad genetics, rationalizing that emaciated horses had always been that way, and testifying emaciated horses had been fed adequately.

On appeal, Kathleen contends her health made it impossible for her to care for the animals. Yet the record at trial reveals despite any health issues, Kathleen was involved in directing ranch operations and feeding the livestock. Indeed, she testified she directed the breeding program as late as June 2015. Like the facts in *James*, the Hoffmans' strategy at trial was that neither was culpable. *See* 763 S.W.2d at 780. Moreover, neither Kathleen nor Herman tried to incriminate the other in any way, consistent with their joint defense. *See id.* Kathleen testified at trial they both did the best they could. The acknowledgment of a hypothetically superior trial strategy on appeal and speculative conflicts does not retroactively create an actual conflict at trial. *Id.*

And although trial counsel testified at the hearing on the motion for new trial, no testimony was elicited from him to develop the record to support Kathleen's claim of conflict of interest or otherwise explain counsel's strategy at trial. Separate counsel for each co-defendant might well have proven much more damaging than the strategy in effect adopted by trial counsel. Any attempt to impeach the other or place blame on the other spouse would have likely elicited specific, damaging, and prejudicial facts. We hold that this record fails to reflect any conflict of interest on the part of retained counsel.

## 2. Brady/Michael Morton Act Violations

In her second issue, Kathleen complains the trial court erred in denying her motion for mistrial and motion for new trial based on *Brady* and Michael Morton Act violations.

In *Brady v. Maryland*, the United States Supreme Court held a defendant's due process rights are violated when the prosecution suppresses evidence favorable to an accused where the evidence is material, regardless of the prosecution's good faith or bad faith. 373 U.S. 83, 87 (1963). Before an appellate court can find reversible error for a *Brady* violation, the defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the evidence withheld is favorable to the defendant; and (3) the evidence is material, i.e., there is a reasonable probability had the evidence been disclosed, it would have changed the outcome of the trial. *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). "'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 109–10 (1976)); *see also Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011). And the Brady rule does not apply when the defendant was

already aware of the information. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002) (citing *Havard v. State*, 800 S.W.2d 195, 204 (Tex. Crim. App. 1989)).

The Michael Morton Act is codified in Texas Code of Criminal Procedure Article 39.14. *See* Tex. Code Crim. Proc. Ann. art. 39.14 (West 2017). It requires the State, upon request, to disclose certain items to a defendant. *See id.* art. 39.14(a); *Glover v. State*, 496 S.W.3d 812, 815 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). If the State has not received a request, it only has an affirmative duty to disclose exculpatory information. Tex. Code Crim. Proc. Ann. art. 39.14(h); *Glover*, 496 S.W.3d at 815.

Here, much of the evidence the Hoffmans complained of was found by the trial court to be irrelevant or not in existence. The trial court explained documentation and records for animals seized that were not the subject of the criminal trial were not relevant. The Hoffmans contended those records would have shown the large remainder of the herd was healthy. But such records were not shown to have any bearing on the condition of the five horses in the criminal complaints. This is particularly true given the fact law enforcement officials and a veterinarian of the Hoffmans' choice instructed the Hoffmans to separate the weaker and thinner horses from the herd to ensure they had adequate access to feed. Moreover, with respect to evidence of the five specific horses at issue, the State explained in pretrial

hearings necropsies were not performed on all the animals and therefore, the documents being requested did not exist.

Dr. Crum testified at trial that the interpretation of the blood tests was included in the veterinary records, but the full blood work was stored in a database. The medical records summarizing the blood tests revealed the animals were malnourished, which certainly could not be considered exculpatory. The State maintained they provided the veterinary records on the five horses at issue, and at trial, Dr. Crum acknowledged some of the records contained mistakes. When defense counsel moved to strike all the veterinary records because they were "inherently unreliable on critical issues[,]" the trial court overruled the objection and noted it went to the weight and not the admissibility of the evidence. While the Hoffmans complained about the missing blood test results, the discovery they propounded did not specifically request those results. The State's duty to provide information under the Michael Morton Act is only triggered upon a timely request. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a). Under *Brady* and the Michael Morton Act, the State has only an affirmative duty to produce exculpatory information. *See id.* art. 39.14(h); *Brady*, 373 U.S. at 87. The Hoffmans' suspicions the State had not produced evidence does not establish its materiality. *See Hampton*, 86 S.W.3d at 612. For these reasons, we conclude the Hoffmans have not met their burden of

28

establishing the materiality of the evidence, that it was exculpatory, or that such evidence existed.

The Hoffmans also complain of records seized from their home pursuant to a warrant, specifically veterinary records and feeding records. They argue these records are exculpatory and would prove they provided proper care and food to the horses. At trial, Herman testified a vet recommended they not perform surgery on Horse 287593's broken jaw. Herman also testified two different veterinarians examined the leg of Horse 287609 on three or four occasions and advised the Hoffmans to spray it with a water hose, allowing it to heal from the inside out. According to Herman, the vet told them there was not "a thing you can do about it." The Hoffmans did not call the veterinarians that allegedly gave this advice to testify at trial nor did they subpoena records to support these claims. If the records Herman described existed, the Hoffmans knew about them. *Brady* applies when there is information the prosecution is aware of, but a defendant is not. *Hayes*, 85 S.W.3d at 815. Thus, *Brady* would not apply to these records.

The Hoffmans repeatedly argue the State "singled out" five horses in bad shape, and since the animals were in a herd, they should be able to show the condition of the other horses in the herd as proof they were not guilty of cruelty. At multiple pretrial hearings, the trial court ruled evidence about the condition of the

other seized animals was not relevant. This included medical records, blood tests, and necropsy reports. The trial court instructed the Hoffmans that they could subpoena any necropsy reports the Hoffmans maintained were missing or that the State did not have in its possession, directly from the SPCA, which they failed to do.

From the record before us, we conclude the trial court did not abuse its discretion in denying Kathleen's motion for mistrial or motion for new trial. We overrule Kathleen's first and second issues.

## C. Double Jeopardy

Kathleen argues in her fourth issue she was prosecuted twice for the same offenses in violation of the Double Jeopardy clauses of the United States and Texas Constitutions. The United States Constitution provides, "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. CONST. amend. V. The Texas Constitution provides, "No person, for the same offense, shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction." Tex. Const. art. I, § 14.

Initially, we must determine whether jeopardy previously attached at the justice court hearing before determining whether Kathleen's subsequent prosecution for animal cruelty was barred by double jeopardy. *See State v. Almendarez*, 301

30

S.W.3d 886, 890 (Tex. App.—Corpus Christi 2009, no pet.) (examining prosecution for cruelty to livestock animals pursuant to Texas Penal Code section 42.09 following a civil seizure trial under Chapter 821 of the Health and Safety Code); *see also State v. Moreno*, 294 S.W.3d 594, 597 (Tex. Crim. App. 2009) (explaining "jeopardy must have attached initially" before double jeopardy protections apply).

Courts have previously examined the statutory scheme involving forfeiture of animals through civil proceedings and subsequent criminal prosecutions or vice versa. *See Almendarez,* 301 S.W.3d at 890. The statutory scheme under Chapter 821 of the Health and Safety Code is civil in nature. *See id.* at 891; *Chambers v. State*, 261 S.W.3d 755, 759 (Tex. App.—Dallas 2008, pet. denied) (noting the State filed "animal cruelty case pursuant to [C]hapter 821 of the [H]ealth and [S]afety [C]ode dealing with the health and safety of animals, not as a crime" under Texas Penal Code section 42.09); *Granger v. Folk*, 931 S.W.2d 390, 392 (Tex. App.—Beaumont 1996, orig. proceeding) (recognizing, although not in a Double Jeopardy case, that this Court noted "two avenues exist for the State in protecting animals from cruel treatment, i.e., criminal prosecution under … the [Texas] Penal Code and the civil remedy provided under [s]ection 821.023 of the [Texas] Health and Safety Code"); *see also Bradley v. State*, No. 01-08-00332-CR, 2009 WL 1688200, at *3 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (mem. op., not designated for

31

publication). "[E]ven in those cases where the legislature has indicated an intention to establish a civil penalty, a court must inquire further whether the statutory scheme is so punitive in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Capps v. State*, 265 S.W.3d 44, 49 (Tex. App.— Houston [1st Dist.] 2008, pet. ref'd) (citing *Hudson v. United States*, 522 U.S. 93, 99 (1997)); *see also Bradley*, 2009 WL 1688200, at *3. The factors courts must look to in making this determination are: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *Hudson*, 522 U.S. at 99–100 (citations omitted).

Texas courts have examined animal cruelty statutes applying the *Hudson* factors. *See Almendarez*, 301 S.W.3d at 892–95; *Bradley*, 2009 WL 1688200, at **3–4. Those courts have concluded the intent of provisions 821.022–.023 of the Health and Safety Code are civil in nature. *See Almendarez*, 301 S.W.3d at 895; *Bradley*, 2009 WL 1688200, at *3. Moreover, those courts analyzed sanctions

similar to the ones the Hoffmans faced here in light of the *Hudson* factors and concluded the sanctions were not "so punitive either in purpose or effect as to transform the civil action and remedies imposed into a criminal punishment" and therefore, subsequent criminal prosecution for cruelty to animals did not violate the double jeopardy prohibitions of the United States and Texas Constitutions. *See Almendarez*, 301 S.W.3d at 895–96; *Bradley*, 2009 WL 1688200, at *4.

In *Almendarez*, the defendant moved to quash an indictment for cruelty to animals on the basis it violated double jeopardy since he had already been subject to proceedings in justice court where two of his horses were seized, and he had to pay restitution to cover the costs. 301 S.W.3d at 888. The court there noted "proceedings brought under Subchapter B of Chapter 821 and the remedies authorized therein are designed to protect animals from cruel treatment, and neither divesting a party from the ownership of cruelly treated animals nor requiring the payment of money for their care are excessive to this alternative purpose." *Id.* at 895. Like our sister court in *Almendarez*, we determine that although larger in scale, the civil seizure of the Hoffmans' horses and fine imposed for their care was not excessive.

We conclude jeopardy did not attach to the civil proceedings, and therefore, the criminal prosecution of Kathleen Hoffman did not violate the Double Jeopardy Clauses of the United States or Texas Constitutions.

33

Issue four is overruled.

## IV. Conclusion

We conclude the evidence was legally sufficient to support Kathleen's convictions of cruelty for each of the five horses at issue. Even if we assume Kathleen's trial counsel's performance was deficient, Kathleen failed to establish she was prejudiced by any such deficiency and therefore, did not meet both prongs required to show ineffective assistance of counsel. Further, Kathleen failed to establish violations of the *Brady* or the Michael Morton Act. Finally, the civil seizure and forfeiture proceedings for cruelty to livestock animals and the criminal prosecution for cruelty to livestock animals is not violative of the Double Jeopardy Clause of the United States or Texas Constitutions. The judgments of the trial court are affirmed.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on September 4, 2018
Opinion Delivered November 14, 2018
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.