

# IN THE
# TENTH COURT OF APPEALS

## No. 10-19-00093-CR

**TYLER CLAY,**

                                                                    **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                                    **Appellee**

### From the 54th District Court
### McLennan County, Texas
### Trial Court No. 2017-1854-C2

## MEMORANDUM OPINION

In this murder-for-hire case, appellant, Tyler Clay, was convicted of capital murder for employing Keith Spratt to murder Joshua Pittman in exchange for payment. In twenty-two issues, Clay challenges his conviction, as well as numerous other rulings made by the trial court. Because we conclude that the trial court erred by disqualifying Clay's co-counsel, Jessica Freud, we reverse Clay's conviction and remand the case for further proceedings.

# I.    CORROBORATION OF AN ACCOMPLICE WITNESS

Clay's sixteenth issue, if sustained, would afford him the greatest relief, as it would afford him an acquittal.  Therefore, that is where our analysis of this case will commence. *See Chaney v. State*, 314 S.W.3d 561, 565 n.6 (Tex. App.—Amarillo 2010, pet. ref'd) ("Generally, when a party presents multiple grounds for reversal, an appellate court should first address those points that would afford the party the greatest relief." (citing TEX. R. APP. P. 43.3; *Bradley Elec. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999))).

In his sixteenth issue, Clay argues that the evidence is legally insufficient to corroborate accomplice witness James Spears' testimony in violation of article 38.14 of the Texas Code of Criminal Procedure.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.14.  We disagree.

## A.    Standard of Review

[U]nder Texas Code of Criminal Procedure Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, non-accomplice evidence that tends to connect the accused to the offense.  Evidence that the offense was committed is insufficient to corroborate an accomplice witness's testimony.  And an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person.

> . . .

When reviewing the sufficiency of non-accomplice witness evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense.  The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case.  The direct or circumstantial non-accomplice

evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence. Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence.

*Smith v. State*, 332 S.W.3d 425, 439, 442 (Tex. Crim. App. 2011) (internal citations omitted); *see Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (noting that appellate courts review non-accomplice witness evidence in the light most favorable to the verdict); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.14.

"There need only be some non-accomplice witness evidence tending to connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) ("No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt."). Furthermore, when reviewing the sufficiency of the non-accomplice evidence, "all of the non-accomplice testimony is viewed together, rather than as isolated, unrelated incidents . . . ." *Simmons v. State*, 282 S.W.3d 504, 511 (Tex. Crim. App. 2009). Moreover, "circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (citing *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)).

**B.    Discussion**

**1.    The Undisputed Facts**

At about 11:00 p.m., on December 23, 2015, Pittman was playing an eight-liner machine at the Pick N Pay on Faulkner Lane in Waco, Texas.  Several other individuals, including Jannice Bell, Donta Stuart, and Myron Burley, were at the Pick N Pay.  Burley recounted that, on the night in question, an individual, who Stuart identified as Spratt, came into the Pick N Pay wearing a hoodie and a bandanna.  Spratt proceeded to the back room where Pittman was playing the eight-liner machine.  Bell testified that she was sitting at a machine near Pittman when she heard multiple gunshots.  In the chaos that followed, Burley discovered Pittman gasping for air with blood "streaming out of him."  Pittman died prior to the arrival of law enforcement.  These facts are undisputed.

**2.    The Testimony of Accomplice James Spears**

What is disputed is Clay's involvement in the shooting.  To establish Clay's involvement, the State presented testimony from James Spears, who admitted that he was a co-conspirator in the death of Pittman.  Spears testified that he knows Clay as "Bull" and that he also knows Spratt and Pittman.  Spears would often hang out at Clay's smoke shop.  Clay later told Spears about a "beef" he had with Pittman.  During this incident, Pittman came to Clay's smoke shop after business hours to obtain cigarettes.  Despite running a smoke shop, Clay informed Pittman that he did not have any cigarettes.

Pittman apparently persisted in trying to get in the store, despite the fact that the store was closed. Clay perceived Pittman's actions as an attempt to rob him.

In a conversation that transpired around Thanksgiving 2015, Clay then described a second incident where Pittman robbed Clay at gunpoint the prior week. Spears noted that Clay wanted revenge and offered him $5,000 to murder Pittman.[1] Spears agreed to do the murder, but did not request payment because he wanted to do a friendly favor for Clay. However, because of his post-indictment bond conditions for an unrelated matter, Spears did not have a gun at the time. Undeterred, Spears made arrangements to procure a gun.

Spears's efforts to procure the gun were stymied when he was arrested while trying to purchase the firearm. While in jail, Spears learned that Pittman had been killed. A few weeks later Spears saw Spratt when they were both in jail. The two apparently

---

[1] In August 2016, after receiving a forty-year offer from the State, Spears wrote a letter to Detective Melissa Thompson of the Waco Police Department to arrange a meeting. In early September 2016, Spears met with Detective Thompson to provide her with information about the Pittman murder in hopes of reducing his jail time for his multiple, pending charges. Spears acknowledged this on the first day of his testimony. However, on the next day of trial, Spears changed his testimony to state that he wrote his letter to Detective Thompson in February 2016, though Detective Thompson confirmed that she received Spears's letter in August 2016. Nevertheless, during his conversation with Detective Thompson, Spears requested the presence of his lawyer. Spears admitted that his lawyer instructed him to communicate with law enforcement and the District Attorney's Office through her, rather than directly, and that she would communicate with law enforcement or the District Attorney's Office. When defense counsel asked whether this strategy was devised to prevent disclosure of the information to the defense through use of the attorney-client privilege, Spears denied knowing the purpose of the strategy. However, Detective Thompson acknowledged that Spears's lawyer told Spears, in Detective Thompson's presence, that the State could not offer him a deal until the case was over to avoid looking like he had been paid for his testimony and that his cases would stall. Nevertheless, later in his conversation with Detective Thompson, Spears indicated that Clay offered him $10,000 to kill Jason Pittman.

communicated with one another through sign language and written prison notes called "kites." Spratt communicated to Spears that he had killed Pittman at Clay's behest in exchange for $15,000. Spears further testified that Spratt confirmed this arrangement to him when the two were in the recreation yard of the jail. Spratt also noted that he got a phone call on the day of the killing telling him that Pittman was at the Pick N Pay. Spears recounted that Spratt was frustrated that he was still owed money for the killing "because he needed that money to bond out." Indeed, one of Spratt's "kites" to Clay's uncle, who was also in jail with Spratt, stated that "Bull" still owed $5,000 for the murder and that Clay and Spratt were "locked in" or connected or, in other words, good with each other.

### 3.    The Non-Accomplice Evidence

Assuming without deciding that Spears is an accomplice in the conspiracy to kill Pittman, we must eliminate Spears's testimony from consideration and look to see if there is any non-accomplice evidence, under the *Smith* standard, that tends to connect Clay to the killing of Pittman. We conclude that there is.

Donta Stuart testified that he was playing an eight-liner machine at the Pick N Pay when Pittman was killed. Stuart saw an individual, later identified as Spratt, enter the Pick N Pay while wearing a hoodie and a homemade mouth covering. Stuart heard the shooter say, "[W]hat's up now, n***a," to Pittman before firing about four shots. In response to the shots fired, Stuart ran and hid inside a cooler at the convenience store.

Later in his testimony, Stuart noted that he knows Clay as "Little Bull" and that they were friendly acquaintances and occasionally spoke to one another prior to the shooting. However, after the shooting, Stuart recounted that both Spratt and Clay followed him and gave him "bad looks," indicating that "[i]t wasn't friendly no more." Stuart described the "bad looks" he received from Spratt and Clay as follows: "[I]t's like you kill somebody, you don't leave no witness." Moreover, despite being friends prior to the shooting, Clay stopping speaking with Stuart after the shooting.

In addition, Detective Melissa Thompson of the Waco Police Department noted that multiple phone calls were made by Clay to Spratt about an hour before and then an hour or two after the shooting. *See Cerna v. State*, 441 S.W.3d 860, 866 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (stating that, among other things, the exchange of text messages between the defendant and an accomplice just before the murder corroborated the testimony of the accomplice). Detective Thompson also stated that Clay was referred to as "Tyler," "Bull," and "Little Bull" in the community and that she was aware that Clay owned a smoke shop and that he had been robbed.

Kimberly King, an investigator for the McLennan County Sheriff's Office, described State's Exhibit 43, which documented phone calls Spratt made to Clay from jail. The phone calls started on February 5, 2016, and ended on June 6, 2016, though the vast majority of the phone calls occurred prior to April 2016. This evidence showed that Spratt called Clay sixty-eight times during this time span, which was shortly after the

shooting, and that all of the calls were designated as "inmate hangup," "no answer," or "not accepted." King also described State's Exhibit 44, which documented nineteen additional phone calls made by Spratt to Clay while Spratt was in jail. All of these calls were designated as "no answer."

The last piece of non-accomplice evidence tending to connect Clay to Pittman's shooting involves Tyquonna Gilmore. In his tenth issue, Clay challenges the admission of Gilmore's testimony. However, as we discuss later, Clay's tenth issue lacks merit.

In any event, at trial, Gilmore testified that she knows Clay as "Bull" and that she frequented Clay's smoke shop and played dice with Clay. Gilmore indicated that she does not have friends, but rather she considered Spratt and Clay her "associates." Gilmore then described a message that Clay wanted her to pass on to Spratt, who was in jail. The substance of the message was as follows: "I told him [Spratt] he need to quit talk—don't call by phone no more. You talk—you talk too much on the phone. Just chill. Wait until you get a bond reduction and we gonna come get you." Gilmore then clarified that she and Clay were "gonna get [Spratt's] cases dropped." Though on cross-examination, Gilmore explained that she told Spratt to chill until he got his bond reduced at an upcoming bond hearing.

After eliminating Spears's accomplice testimony from consideration and then examining the remaining portions of the record, we conclude that there was sufficient evidence tending to connect Clay to the conspiracy to kill Pittman in compliance with

article 38.14 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith*, 332 S.W.3d at 442; *Joubert*, 235 S.W.3d at 731; *Herron v. State*, 86 S.W.3d 621, 632-33 (Tex. Crim. App. 2002) (noting that we examine the strength of non-accomplice witness testimony by its reliability or believability and by the strength of its tendency to connect the defendant to the crime and that this inquiry is satisfied when there is non-accomplice witness evidence, and there is no rational and articulable basis for disregarding the evidence or finding that it fails to connect the defendant to the offense). We therefore overrule Clay's sixteenth issue.

## II. ADMISSION OF TYQUONNA GILMORE'S TESTIMONY

In his tenth issue, Clay contends that the trial court abused its discretion by admitting Tyquonna Gilmore's testimony because her name was deliberately omitted from the State's final witness list provided to defense counsel two weeks prior to trial.[2] As we mentioned earlier, we find that this issue lacks merit.

Generally, notice of the State's witnesses must be given upon request by the defense. *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993). In response to defense counsel's request, the State provided the defense with a preliminary list of ninety potential witnesses, including "Tyquina Gilmore." Noting the number of potential witnesses, defense counsel requested that, once there is a trial setting, that the State

---

[2] Although Clay's tenth issue, if meritorious, would not result in an acquittal, we address the issue because it is necessary to the resolution of Clay's sixteenth issue.

provide him with a "real list of the people it intends to call . . . instead of just saying everybody mentioned in the offense report." The trial court allowed the State to use their preliminary witness list and indicated that this matter would be taken up about thirty days prior to trial. The trial court also stated: "So I want the State to produce the witnesses they in good faith believe they will call in their case-in-chief. It is not a list that will limit you from calling—not calling anybody that you've listed on your full list." Neither party objected to the trial court's statements.

The State then filed its first amended witness list, which specifically listed "Tyquonna Gilmore" as a potential witness. Though the reasons are not clear from the record, the State did not file its first amended witness list until the first day of trial—November 26, 2018. However, in the certificate of service for the first amended witness list, the State indicated that the defense was served with notice of this list by hand delivery on November 5, 2018, and by email on November 4, 2018. *See* Tex. R. Civ. P. 21a(e) ("A certificate by party or an attorney of record, or the return of the officer, or the affidavit of any other person showing service of a notice shall be prima facie evidence of the fact of service."); *see also Ex parte Sinegar*, 324 S.W.3d 578, 518 n.19 (Tex. Crim. App. 2010) (noting that applicant's certificate of service is sufficient evidence of service on the date indicated, absent rebuttal evidence (internal citations omitted)). Moreover, conversations at trial indicated that "Tyquina Gilmore" and "Tyquonna Gilmore" are one and the same person. Because Gilmore was included on the original witness list and the

list provided to defense counsel approximately twenty-one days prior to trial, we cannot say that the trial court abused its discretion by permitting Gilmore to testify. *See Martinez*, 867 S.W.2d at 39. Accordingly, we overrule Clay's tenth issue.

### III. THE DISQUALIFICATION OF CLAY'S TRIAL COUNSEL

In his fourth issue, Clay argues that the trial court erred by disqualifying his co-counsel Jessica Freud two weeks prior to trial. We agree.

### A. Facts

In the instant case, Clay retained attorney Randy Shaffer from Houston and Waco attorney Jessica Freud as co-counsel in October 2017. Seventeen days prior to trial in this capital-murder case and after Freud had represented Clay for more than a year, the State filed a motion to disqualify Freud based on her prior representation of David Mims, a potential State's witness in this case. In its motion to disqualify, the State noted that Mims would not waive any conflict of interest or confidentiality held by Freud. The State further argued that Freud has a continuing duty to Mims to keep confidential any of the communications or matters gained by her prior representation and that disqualification was needed to protect Mims's right to confidentiality.

The trial court conducted a hearing on the State's motion to disqualify Freud. At the hearing, Detective Thompson testified about Mims's conviction for human trafficking, the substance of Mims's potential testimony about Spratt's jailhouse confession, and that Mims approached her with this information in exchange for her

telling the prosecution "that he was cooperating with me." Later, Freud interjected and described her representation of Mims as follows:

> I'm here. I can speak for myself. I sat with Alan [Bennett]. We were going to try Mr. Mims' case. He pled the morning of trial. So, you, Alan and I were going to try Mr. Mims' case and he pled the morning of. I was working on it for probably about two or three months.

Thereafter, the trial judge met with Freud in chambers to discuss the situation. On the record, the trial judge requested that Freud address the motion to disqualify. However, before doing so, Shaffer objected that this was a manufactured motion to create a conflict that did not exist and questioned the State's tactic in waiting until just prior to trial to raise this issue.

Freud explained,

> Sure, Judge. And that's correct. Ms. Laborde [prosecutor], on September 17, did reach out to me telling me that she had just been reassigned from Twin Peaks to this case and is her memory correct because she and Ms. Hunting Horse were also the prosecutors on Mr. Mims' case, was her memory correct that I was working with Mr. Bennett on it. And I told her, her memory was correct. And if Mr. Mims was going to be a State's witness—at that time, the only witness list that we had was the November 2017 witness list prepared by the previous prosecutor, Mr. Robertson, and there are 90 individuals. It was just like we had previously discussed, just a list of everybody listed in the offense report. And based on my review of the offense report, in October of 2017, we had gotten the first round of discovery, which included a 520-page offense report. In that report, Mr. Mims is listed substantively on one page and there's four sentences that I believe Mr. Shaffer just walked through with Ms.—with Detective Thompson. And so based on what I had had there was nothing to suggest to me that Mr. Mims was going to be a testifying witness in this case. After Ms. Laborde had sent me the email on September 17, then on October 23rd is when we got the State's round six production of discovery and in that was Mr. Mims' interview from, I guess, August. And so at that point, that

was really the only time that I was put on notice that he could be a testifying witness. And I got that—I reviewed that discovery on October 24th and today is November 9th. And so in terms of—I want the Court and everybody to understand in terms of when I was put on notice that he would actually be or could potentially be a testifying witness, that was on October 23rd. When I review the interview was on October 24th.

The State then emphasized that Mims's testimony, though substantively similar to the testimony of Spears and others, was needed because Mims was not from Waco and that he "doesn't have built-up grudge or built-up backstories with the other people involved in the case. And he shouldn't have knowledge of what's gone on and where these places are around Waco because he's not from here and spends very little time here. So we think he's quite valuable."[3]

Subsequently, the trial judge indicated that he needed to take up some matters ex parte with Freud and the court reporter. Shaffer objected and requested that he be allowed to be present "to perfect the record in terms of what happens . . . ." Freud responded that she would not give any privileged information in front of Shaffer and emphatically stated, "I'm not talking." Shaffer argued that there was no need to disclose any privileged information because all the defense is entitled to impeach a witness with is a conviction, not the underlying facts or details. In response, Freud requested that she be allowed to speak with the trial judge ex parte about the situation. Shaffer objected "to

---

[3] In fact, Mims's testimony was so valuable that the State did not call him as a witness. At the hearing on Clay's motions for mistrial and new trial, the State stated that they intended to call Mims as a witness, but did not do so because of the trial court's ruling to exclude certain jailhouse phone calls based on the State's failure to timely produce said phone calls upon request by the defense.

being excluded from the in camera conference." The trial judge stated that: "It appears that this conflict has driven a wedge between the attorneys for Mr. Clay in this matter." When the trial judge requested a response from Freud regarding Shaffer's objection and her position regarding her ethical obligations should Mims be called as a witness in this matter, Freud noted: "That I have a conflict." The trial court granted the State's motion to disqualify.

## B.    Applicable Law

"A criminal defendant has a right to secure counsel of his or her own choice." *Gilmore v. State*, 323 S.W.3d 250, 264 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006); *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); *Powell v. Alabama*, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932) ("It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.")). "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of representation he received." *Gonzalez-Lopez*, 548 U.S. at 148.

However, "the defendant's right to counsel of choice is not absolute." *Gonzalez v. State*, 117 S.W.3d 831, 837 (Tex. Crim. App. 2003) (citing *Wheat*, 486 U.S. at 159). "[W]hile there is a strong presumption in favor of a defendant's right to retain counsel of choice,

this presumption may be overridden by other important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice." *Id.* (citing *Wheat*, 486 U.S. at 158-60). Among other things, "a trial court[] [has] wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152 (citations omitted); *see Childress v. State*, 794 S.W.2d 119, 121 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd) ("This right [to obtain counsel of one's own choice] cannot be manipulated so as to obstruct the orderly procedure in the courts and must be balanced with a trial court's need for prompt and efficient administration of justice.") (citing *Thompson v. State*, 447 S.W.2d 920, 921 (Tex. Crim. App. 1969)); *see also Ex parte Windham*, 634 S.W.2d 718, 720 (Tex. Crim. App. 1982).

Texas courts have often looked to the disciplinary rules to decide disqualification issues. *See, e.g., In re Meador*, 968 S.W.2d 346, 350 (Tex. 1998); *In re Goodman*, 210 S.W.3d 805, 809-16 (Tex. App.—Texarkana 2006, orig. proceeding). "While the disciplinary rules are merely guidelines for court-ordered disqualification (rather than controlling standards), these rules do provide guidance—even in cases where an attorney may not have clearly violated one of this State's disciplinary rules." *Landers v. State*, 229 S.W.3d 532, 535 (Tex. App.—Texarkana 2007), *aff'd*, 256 S.W.3d 295 (Tex. Crim. App. 2008) (citations omitted). "The rules should not be used as a tactical weapon to disqualify opposing counsel for their alleged disciplinary rule violations . . . ." *House v. State*, 947

S.W.2d 251, 253 (Tex. Crim. App. 1997); *see In re Bahn*, 13 S.W.3d 865, 873 (Tex. App.—

Fort Worth 2000, orig. proceeding) (stating that courts "must adhere to an exacting

standard when considering motions to disqualify so as to discourage their use as a

dilatory trial tactic").

> [W]hen a trial court unreasonably or arbitrarily interferes with the defendant's right to choose counsel, its actions rise to the level of a constitutional violation. Therefore, courts must exercise caution in disqualifying defense attorneys, especially if less serious means would adequately protect the government's interests.
>
> In moving to disqualify appellant's counsel of choice, the government bears a heavy burden of establishing that disqualification is justified.
>
> Counsel may be disqualified under the disciplinary rules when the opposing party can demonstrate actual prejudice resulting from opposing counsel's service in the dual role of advocate-witness. Allegations of one or more violations of the disciplinary rules or evidence showing only a possible future violation are not sufficient.

*Gonzalez*, 117 S.W.3d at 837 (internal footnotes omitted).

When the trial court disqualifies an attorney, we review its decision for an abuse

of discretion. *See Landers v. State*, 256 S.W.3d 295, 303 (Tex. Crim. App. 2008). When

reviewing factual determinations, we afford almost total deference to those trial-court

findings that the record supports, especially those findings that turn on evaluating

credibility and demeanor. *Id.* But when reviewing how the trial court applied the law to

the facts, we use the no-deference de novo standard. *Id.*

## C.     Discussion

Here, Freud did not represent Mims in this matter or in a substantially-related matter to that in which she represented Clay. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.09; *see also Landers*, 229 S.W.3d at 535 ("We have held that two matters are 'substantially related' within the meaning of Rule 1.09 when a genuine threat exists that a lawyer may divulge in one matter confidential information obtained in the other because the facts and issues involved in both are so similar." (quoting *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 51 (Tex. 1998))). Therefore, any continuing duty Freud owed to Mims by virtue of her prior representation stemmed from Texas Disciplinary Rule of Professional Conduct 1.05's prohibition against the use of confidential information. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.05(b)(3) (providing that "a lawyer shall not knowingly . . .[u]se confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation of the confidential information has become generally known").

On the facts presented here, the potential for such a conflict was not significant. First, we are not persuaded that Freud would have had to choose between Clay's and Mims's interest in this case because when impeaching Mims, the examining lawyer could not go behind the face of the judgment and explore the underlying facts of the conviction, which could encompass privileged information. *See Bowen v. Carnes*, 343 S.W.3d 805, 816 (Tex. Crim. App. 2011) (holding that a trial court abused its discretion when it

disqualified retained counsel because of his former representation of one of the State's key witnesses against his client); *James v. State*, 763 S.W.2d 776, 789 (Tex. Crim. App. 1989) ("[A]n actual and significant conflict of interest of the degree requiring reversal exists when one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing." (internal citations & quotations omitted)); *Barbaro v. State*, 115 S.W.3d 799, 802 (Tex. App.—Amarillo 2003, no pet.) ("In short, having represented a witness at a prior time does not alone mean that counsel is required to make a choice between advancing his current client's interests in a fair trial or advancing other interests to the detriment of his client. More is required before it can be said that a conflict actually exists."); *see also Mays v. State*, 726 S.W.2d 937, 953 (Tex. Crim. App. 1986) ("[A]lthough the fact that a witness has been previously convicted of a crime may be introduced into evidence, the details of that offense are inadmissible.").

Second, there were less serious means that could have been employed that would have adequately protected the interests of both the government and Mims. Specifically, it was mentioned at the hearing on the motion to disqualify that Freud's co-counsel, Shaffer, did not have confidential information about Mims and, thus, could cross-examine Mims without Freud's participation. *Cf. Brink v. State*, 78 S.W.3d 478, 485 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("Here, the record reflects an actual conflict of interest because Parnham acknowledged he was not sure how he would cross-examine

Gipp and attack her credibility without using privileged information obtained while he was her attorney. Thus, Parnham would have been required to make a choice between advancing appellant's interests and protecting confidential information he acquired from a former client."). The record does not reveal that this suggestion was explored or considered as a less serious option to the disqualification of Freud.

Third, notwithstanding the fact that the State waited until seventeen days prior to trial to file its motion to disqualify, the allegations made by the State show only a remote future violation of Rule 1.05, which is insufficient to warrant the disqualification of Clay's retained counsel. *See Gonzalez*, 117 S.W.3d at 837 ("Allegations of one or more violations of the disciplinary rules or evidence showing only a possible future violation are not sufficient."); *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding) ("Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice," then, to merit disqualification); *see also In re Fletcher*, 584 S.W.3d 584, 589 (Tex. App.—Houston [1st Dist.] 2019, orig. proceeding) ("The appearance of a conflict of interest may not suffice to show good cause for removal.").

Fourth, even taking the State at its word, the potential content of Mims's testimony—his description of Spratt's jailhouse confession—is arguably cumulative of other testimony—namely, the testimony of Spears—and, thus, was not necessary in this

case, apart from the State's use of it to disqualify Freud just prior to trial.[4] *See Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988) (explaining that appellant would not have benefitted from cumulative testimony). This is further demonstrated by the fact that the State ultimately did not call Mims as a witness in this case.

And finally, we note that even though Freud indicated that she had a conflict when asked to respond to Shaffer's objection to the trial court's refusal to allow him to participate in the in camera conference, this expression is not dispositive of the disqualification issue, especially in light of the foregoing. *See In re Fletcher*, 584 S.W.3d at 589 ("Even an attorney's belief that a judge's decision renders him unable to provide effective assistance of counsel is not grounds for that attorney's removal." (citing *Harling v. United States*, 387 A.2d 1101, 1106 (D.C. 1978))).

Therefore, based on the foregoing, we conclude that the trial court abused its discretion by disqualifying Freud as co-counsel for Clay. *See Landers*, 256 S.W.3d at 303. The unreasonable or arbitrary interference with Clay's right to choose his own counsel rises to the level of a constitutional violation. *See Gonzalez-Lopez*, 548 U.S. at 150 (holding that "erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error"); *see also Gonzalez*, 117 S.W.3d at 837. And because this error is structural in nature,

---

[4] It is also noteworthy that the defense offered to stipulate to Mims's testimony, but the State refused to accept a stipulation.

the case must be reversed without conducting a harm analysis because the error undermines "the fairness of a criminal proceeding as a whole." *United States v. Davila*, 569 U.S. 597, 611, 133 S. Ct. 2139, 186 L. Ed. 2d 139 (2013); *see Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (noting that "structural error" is a fundamental constitutional error that defies analysis by harmless-error standards); *see also Schmutz v. State*, 440 S.W.3d 29, 35 (Tex. Crim. App. 2014) ("A structural error affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself, and is not amenable to a harm analysis." (internal quotation & citation omitted)). Accordingly, we sustain Clay's fourth issue.

## IV. CONCLUSION

Because we sustain Clay's fourth issue, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion. And despite several other potentially meritorious issues, we need not address Clay's remaining issues, as they do not afford him greater relief. *See* TEX. R. APP. P. 47.1.


JOHN E. NEILL
Justice

Before Chief Justice Gray,
     Justice Neill, and
     Visiting Justice Rose[5]
Reversed and remanded
Opinion delivered and filed May 25, 2021
Do not publish
[CRPM]



[5] The Honorable Jeff Rose, Visiting Justice, sitting by assignment. *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.

Clay v. State                                                                       Page 22